Filed 5/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM HENRY DEEGAN,<br><br>    Defendant and Appellant. | A143344<br><br>(San Francisco City and County<br> Super. Ct. No. SCN219186) |

William Henry Deegan was convicted by a jury of three felony counts: assaulting a park ranger with a deadly weapon other than a firearm, assaulting a police officer with a deadly weapon, and forcibly resisting three police officers based on threats and violence. As to the forcible resistance, he was also found guilty of an enhancement based on his personal use of a deadly weapon. The trial court sentenced him to imprisonment for six years, consisting of consecutive terms of one year, four years and eight months, respectively, for the three counts, and an additional four months for the weapon enhancement. Deegan appeals, challenging his sentence under Penal Code section 654.[1] He argues that the assault and forcible resistance charges with respect to the police officers are based on the same conduct and intent and that he therefore may not be punished for both. We disagree and affirm the trial court decision.

---

[1] All further statutory references hereafter are to the Penal Code.

# BACKGROUND

## I.

### *The Charges*

Deegan was charged by information with the following three felonies: count I: assault with a deadly weapon, a wooden log, on Park Ranger Jason Schmaltz, in violation of section 245, subdivision (a)(1); count II: assault on a peace officer, specifically, San Francisco Police Sergeant Carrasco, with a deadly weapon, a wooden log, while the officer was engaged in the performance of his duties, in violation of section 245, subdivision (c); and count III: attempt by means of threats and violence to deter and prevent San Francisco Police Officers Carrasco, Johnson and Heppler from performing a duty imposed on them by law and resisting them in performance of their duties by the use of force or violence, in violation of section 69 (resisting with force). In connection with count III, the information also charged Deegan with an enhancement under section 12022, subdivision (b)(1): personal use of a deadly and dangerous weapon, a wooden log.

## II.

### *The Evidence at Trial*

At trial, Park Ranger Schmaltz and Officers Johnson and Carrasco testified to the following facts. Schmaltz, while on patrol on the morning of September 9, 2012, encountered Deegan sleeping in Golden Gate Park. Schmaltz woke Deegan, requested his identification and prepared a citation. When he asked Deegan to sign the citation, Deegan reached into a pile of plastic bags and pulled out a log[2] that was about 14 inches long and 3 inches in diameter. After Schmaltz repeatedly ordered Deegan to drop the log, Deegan instead attacked him with it. Schmaltz attempted to fend off the attacks by raising his baton and retreating, and used his radio to call for backup. Deegan continued to approach and swing the log at Schmaltz's head despite Schmaltz's continued orders

---

[2] The testimony refers to what Deegan was carrying as either a "stick" or a "log." We use the word "log" throughout for convenience.

that he stop. Schmaltz's use of pepper spray was ineffective, and ultimately Deegan pushed Schmaltz into a tree and swung the log at his face, hitting him on the left cheek. Schmaltz ultimately managed to run away.

About ten minutes after this altercation ended, three San Francisco police officers arrived. Schmaltz, accompanied by Officer Andrew Johnson, began searching for Deegan at the campsite, while the two other officers, Troy Carrasco and William Heppler, searched a different area. Deegan came out from behind a tree with a log in his hand, Johnson pulled his firearm, ordered Deegan to stop and to drop the log, but Deegan continued to advance toward him with the log raised. Before reaching Johnson, however, Deegan turned suddenly and ran in the opposite direction, and Johnson and Schmaltz lost sight of him.

At some point after that, Carrasco and Heppler separated from each other, and shortly after they did, Carrasco heard Heppler yelling. Carrasco ran through the trees in the direction of Heppler's voice. As he was running, he heard Heppler shouting: " 'Get on the ground.' " and " 'Drop it.' 'Drop it.' 'San Francisco Police.' 'Don't make me shoot you.' " Carrasco found Heppler with Deegan "on high ground" with "something in [Deegan's] hand . . . advancing on Officer Heppler." Carrasco drew his gun, turned toward Deegan, displayed his badge, ordered Deegan to "drop it," and informed Deegan he was under arrest. Deegan continued to advance downhill first toward Carrasco and then toward Heppler, even though "there were all these different avenues that the guy had to get away, to run away from us." As Deegan was advancing on Heppler, Carrasco managed to get uphill from Deegan, shouted to get his attention, and began to run downhill at him, hoping to subdue him without shooting him. At that point Deegan charged at Carrasco, came down on top of him, and struck him with the log. The two rolled downhill, Carrasco feeling as though he was going to lose consciousness and calling to Heppler for help.

In the meanwhile, Johnson had put out on the radio that Deegan was headed north toward John F. Kennedy Drive, and then "heard that there were officers up there." He went to his vehicle to retrieve a beanbag gun, and then heard "the commotion which

3

sounded like other officers had, you know, intercepted [Deegan]." He ran toward what he heard, and found his fellow officers, Carrasco and Heppler, "on the ground engaged in . . . a struggle" with Deegan. Deegan was "violently trying to resist, you know, giving up his arms," "flailing wildly" while Carrasco was "on top of him, trying to, you know, pry his arms away." "Office Heppler was in there, too, trying to, you know, pull an arm out." Johnson "jumped on and tried to assist in the apprehension," and it took them "a good 30 seconds more after [Johnson] got there to finally get one cuff on and then the other cuff." At that point, Deegan finally stopped struggling. Johnson realized then that Carrasco was "injured pretty bad" and that they had been rolling around in poison oak.

Carrasco sustained a concussion and two broken teeth requiring crowns from Deegan's attack with the log. He also suffered "probably the worst-case of poison oak that I have ever had in my life," which lasted almost four weeks and resulted in "[t]hree visits to the emergency room to deal with respiratory issues."

An investigating officer also testified, and his recorded interview of Deegan was played for the jury. In the interview, Deegan stated he had been homeless for about 12 years, a park ranger had told him he could not sleep in the park during the day, and he therefore began to sleep in the park at night. When Schmaltz ticketed him for sleeping in the park at night, Deegan felt Schmaltz was "violating my right and I tried to fight [him]." He fought the police, too, "[b]ecause I feel like that, um, they're on the ranger's side, in regards to, uh, not to letting me sleep in Golden Gate Park that day." He "was trying to take the law into my own hands." He felt the officers were breaking the law in assisting the ranger.

Deegan did not testify or call any witnesses at trial.

### III.

### *The Court's Comment During Deegan's Closing Argument*

During his closing argument, defense counsel argued that "since the prosecution is alleging that [Deegan] resisted all three [of the police officers], the prosecution has the burden of proving that [Deegan] resisted all three of them. If he does one, that is not

4

good enough.  If he does two, that is not good enough.  Three.  He says all three in the charge."

The court interrupted, stating:  "It is 'or.'  They are required by law to use 'and.'  They have to do that.  It is 'or.'  One or the other or the other or all three of them."

Defense counsel did not object but continued to argue, claiming Deegan did not use any force against any of the officers.

## IV.

### *The Instructions on Count III*

The trial court instructed the jury on each of the counts charged, as well as on lesser included offenses.  Regarding count III, the court instructed the jury as follows:

"The defendant is charged in Count III with resisting an executive officer in the performance of that officer's duty in violation of Penal Code section 69.

"To prove that the defendant is guilty of this crime, the People must prove the following:

"1.  The defendant unlawfully used force or violence to resist an executive officer;

"And

"2.  When the defendant acted, the officer was performing his lawful duty;

"And

"3.  When the defendant acted, he knew the executive officer was performing his duty.

"An executive officer is a governmental official who may use his own discretion in performing his job duties.  A police officer is an executive officer.  A sworn member of the San Francisco Police Department is a peace officer.

"The duties of a police officer include the investigation of crimes, interviewing witnesses and suspects, and detaining and arresting suspects."

After instructing on the lesser included offense of resisting an executive officer, the court further instructed the jury regarding "what constitutes lawful performance of duty as it applies to the evidence in this case."  The initial portion of that instruction (which is the only portion relevant to this appeal) was as follows:

"The People have the burden of proving beyond a reasonable doubt that Officer Johnson, Officer Troy Carrasco, and William Heppler were lawfully performing their duties as peace officers. If the People have not met this burden, you must find the defendant not guilty of assault on peace—on a peace officer with a deadly weapon, as charged in Count II, and not guilty of resisting an executive officer in the performance of duty, as charged in Count III, or of resisting arrest in violation of Penal Code section 148, the lesser included offense as to Count III."

The court instructed the jury regarding the weapon enhancement charge for count III as follows:

"As to Count III, there is a special—an additional allegation and I will instruct you on it.

"If you find . . . the defendant guilty of the crime charged in Count III, namely, resisting executive officers, you must then decide whether the People have proved the additional allegation that the defendant personally used a deadly and dangerous weapon during the commission of that crime.

"A deadly or dangerous weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed, where the person who possessed the object was going, and whether the object was changed from its standard form, and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"Someone personally uses a deadly or dangerous weapon if the person intentionally does any of the following:

"1. Displays the weapon in a menacing manner;

"Or

6

"2. Hits someone with the weapon.

"The People have the burden of proving each allegation or proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

Regarding the mental state required for count III, the court instructed the jury: "The specific mental state required for the crime of resisting executive officers is that when the defendant acted, he knew that the executive officers were performing their duty."

## V.

### *The Verdict*

The jury returned a verdict finding Deegan guilty on all three counts as well as finding true the allegation supporting the weapon related sentence enhancement for count III. As to count I, the verdict specified that the jury found Deegan guilty of assault with a deadly weapon on Park Ranger Jason Schmaltz. As to count II, the verdict specified that the jury found Deegan guilty of assault with a deadly weapon on Sergeant Carrasco. As to count III, however, the verdict stated that the jury found Deegan guilty of "knowingly and unlawfully resist[ing] by the use of force and violence peace officers in performance of their lawful duties."

## VI.

### *The Sentence*

The trial court initially imposed a sentence of six years and eight months on Deegan, consisting of consecutive terms of one year, for count I (assault with deadly weapon on park ranger); four years for count II (assault with deadly weapon on peace officer); eight months for count III (resisting officers by use of violence and threats); and one year for the deadly weapon enhancement on count III. The court rejected Deegan's motion requesting that it stay execution of count III and the weapon enhancement, stating: "The Court evaluates the sentencing in this case under provisions of Section 654. I don't believe that there are any legal requirements that would require the Court to stay any punishment in this case. Count Number I involves a separate victim than Count

7

Number II. And Count Number III includes the crimes against officers other than . . . Sergeant Carrasco."

Subsequently, the court granted a defense motion to correct the sentence as to the count III enhancement and certain credits. Ultimately, Deegan was sentenced to four months, rather than one year, for the count III enhancement, meaning that he was sentenced to a total term of six years.

## DISCUSSION

### I.

### *The Law Regarding Multiple Punishment*

As indicated, Deegan's appeal challenges his sentence only, not his conviction. His argument is based on section 654. That section provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

" 'In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. "In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.' " ' " (*People v. Correa* (2012) 54 Cal.4th 331, 337; see § 954.) "Section 654 bars separate punishment for multiple offenses arising out of a single, indivisible course of action." (*People v. Neely* (2009) 176 Cal.App.4th 787, 800.) Its purpose is "to ensure that a defendant's punishment will be commensurate with his culpability." (*Correa*, at p. 341.)

" 'If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the

8

offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative.' (*People v. Knowles* (1950) 35 Cal.2d 175, 187.) [¶] The 'singleness of the act,' however, is no longer the sole test of the applicability of section 654. ' "Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a course of conduct violated more than one statute . . . within the meaning of section 654." [*People v. Brown* (1958) 49 Cal.2d 577, 591.] [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; italics added.)" (*People v. Beamon* (1973) 8 Cal.3d 625, 637, fn. omitted, disapproved on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896.)

But even if a course of conduct is "directed to one objective," it may "give rise to multiple violations and punishment" if it is "divisible in time." (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639, fn. 11; see, e.g., *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253–1254.) Where the defendants' acts are "temporally separated" they "afford the defendant opportunity to reflect and to renew his or her intent before committing the next [offense], thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

Finally, "even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim." (*People v. Ramos* (1982) 30 Cal.3d 553, 587, revd. on other grounds in *California v. Ramos* (1983) 463 U.S. 992.) The "multiple victim" exception, like the other situations in which multiple punishment is permitted, is based on the greater culpability that attends commission of an act or acts of violence that may or do cause harm to more than one person. (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

## II.

### *Multiple-Victim Exception*

Deegan first contends the trial court erred in failing to stay execution of his one-year sentence for his forcible resistance conviction (count III) and the related weapon enhancement[3] because it was part of the same course of conduct for which he was convicted of assault with a deadly weapon on Sergeant Carrasco (count II) and sentenced to four years. Anticipating the People's argument that the multiple-victim exception applies, Deegan argues that, given the trial court's "instruction" during defense counsel's closing argument, the jury's conviction of him on counts II and III may well have been based on his acts with respect to a single victim: Sergeant Carrasco.

The People take issue with Deegan's description of his crimes as "one course of conduct," arguing that they were instead divisible because they "took place in various parts of Golden Gate [P]ark, involved several officers, and were spread out over one hour." Further, as Deegan anticipated, the People argue that "[Deegan's] convictions and sentence are likewise justified under the 'multiple victim exception' to section 654." Regarding Deegan's contention that the court's instruction allowed the jury to convict him of the count III charge of resisting a peace officer with force or threats based solely on Deegan's acts toward Sergeant Carrasco, the People contend that the written instructions provided to the jury "accurately stated that 'the People must prove that . . . [t]he defendant willfully resisted Officer Carrasco, Officer Johnson, and Officer Heppler in the performance or attempted performance of [their] duties.' "

We agree with the People. In *People v. Martin* (2005) 133 Cal.App.4th 776 (*Martin*), the Second District Court of Appeal had occasion to address the application of section 654 in a case similar to this one in many respects. There, the defendant, Martin, assaulted and threatened his wife, and a neighbor summoned the police. (*Martin*, at p. 779.) Four officers arrived, and after speaking with Martin and his wife, one of the

---

[3] This one-year sentence was comprised of eight months for the count III conviction plus four months for the related weapon enhancement.

10

officers decided to arrest Martin. (*Id*. at p. 780.) The officer placed Martin under arrest and handcuffed him. As two other officers were walking him to the patrol car, he tensed up, said he was not going to jail and that the officers would have to shoot him. (*Ibid*.) He bent over, whereupon one of the officers placed him in an "arm-bar hold." He then "jerked his body backwards and wrapped his leg around [one officer's] leg," causing the officer to experience sharp pain and a shoulder injury. (*Ibid*.) Another officer knocked Martin to the ground, where he "flailed around" and kicked at two other officers' legs as they tried to control his lower body. (*Ibid*.) Ultimately, all four officers used a restraint procedure that enabled them to control Deegan.

Martin was charged with and convicted of spousal battery, resisting arrest, and battery on a peace officer, and the trial court sentenced him to three concurrent 25-years-to-life terms under the Three Strikes law. (*Martin*, *supra*, 133 Cal.App.4th at p. 780.) On appeal, he argued the trial court should have stayed execution of sentence on either the resisting arrest conviction or the battery on a police officer conviction because "both offenses were incident to his sole objective to escape." (*Ibid.*) While the appellate court agreed with Martin that "his sole objective in both resisting arrest and committing battery on a police officer was to free himself" (*id*. at p. 781), it affirmed the trial court's sentencing decision based on the multiple-victim exception. (*Id*. at pp. 782–783.) Martin argued the multiple-victim exception did not apply to resisting arrest with force under section 69 because it was not a crime of violence committed against a victim for purposes of that exception. (*Martin*, at pp. 782–783.) He contended that the force and violence used to resist arrest is directed not against the officer but " 'to get away from the officer.' " (*Id*. at p. 782.) The court disagreed. The crime of resisting or deterring an officer by use of force or threats under section 69 "is designed to protect police officers against violent interference with performance of their duties. [Citation.] While the object of the offense may not be to attack a peace officer, its consequence is frequently to inflict violence on peace officers, or subject them to the risk of violence." (*Martin*, at p. 782.) "Whether the purpose of violence is to inflict harm on the officers or the harm is merely incidental to the goal of facilitating the perpetrator's escape," the court concluded,

11

"the consequence is the same; peace officers are subjected to violence and injury. As a result, the multiple-victim exception is applicable here, because [Martin] committed acts of violence against more than one victim; he resisted arrest by four different officers and battered one of them." (*Id*. at p. 783.)

The People argue that *Martin* supports the trial court's application of the multiple-victim exception here. As Deegan points out, however, the court in *Martin* "did not discuss either the charging document, the court's instructions to the jury, or what findings the jury may have made regarding the resisting." Here, Deegan argues, the court's instructions enabled the jury to convict him of resisting with force under section 69 based on his acts with respect to Carrasco, and it thus did not necessarily find that he forcibly resisted Heppler or Johnson.

It is true that the instructions to the jury on count III were confusing with regard to whether the jury was being asked to find Deegan resisted one or more than one of the officers. The People argue otherwise, but they cite only the instruction on the lesser included offense of resisting an officer (without the force or threats element) under section 148. The instructions regarding the resisting with force charge on which the jury convicted Deegan referred in some places to "an executive officer," "the executive officer" or "the officer," and in other places to "resisting executive officers," "the executive officers" and "Officer Johnson, Officer Troy Carrasco, and William Heppler." (See pp. 5–6, *ante*.)

The premise of Deegan's argument is that absent a clear indication that the jury specifically based its verdict on count III on Deegan's having resisted with force one or both of the officers other than Carrasco, the trial court had to presume that it did *not* do so in making the sentencing decision. And if the trial court presumed the jury found only resistance by Deegan with respect to Carrasco, the multiple-victim exception would not apply. The problem with this argument is that Deegan fails to distinguish between the validity of the *conviction* for resistance with force, which he concedes, and the validity of the *sentence* for that offense. It is the jury who had to decide whether the facts were

12

sufficient to meet the elements and thus to convict Deegan of that crime. But it was the judge who imposed the sentence.

"Ordinarily, in determining whether Penal Code section 654 applies, the trial court is entitled to make any necessary factual findings not already made by the jury." (*People v. Centers* (1999) 73 Cal.App.4th 84, 101; accord, *People v. Leonard* (2014) 228 Cal.App.4th 465, 499–500; see also *People v. Osband* (1996) 13 Cal.4th 622, 730–731 [affirming decision not to stay sentence for rape and robbery under section 654 even though it was unclear whether murder conviction was based on felony murder or premeditation theory, agreeing with People's argument that trial court "implicitly found that the crimes . . . involved more than one objective"].) Contrary to Deegan's argument that the jury must make the relevant findings, the courts have held that "in the absence of some circumstance 'foreclosing' its sentencing discretion . . . , a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340.)

Here, the sentencing judge was the trial judge, who, like the jury, observed all the evidence. At sentencing, the court relied on the multiple-victim exception in denying Deegan's request for a stay of the sentence on count III and the related enhancement, specifically finding that Deegan's count III conviction, for resisting an officer with threats or force, was for conduct involving all three officers, i.e., it "include[d] the crimes against officers other than . . . Sergeant Carrasco." Thus, in the court's view, even assuming Deegan's act of hitting Carrasco with the log was the basis for both the assault on a peace officer comprising count II and, in part, the resistance with force or threats comprising count III, Deegan also resisted with force or threats Officer Heppler and/or Officer Johnson. And reviewing that finding for substantial evidence, as we must,[4] we conclude that the finding was amply supported by the evidence at trial.

---

[4] "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them. [Citations.] 'We must "view the evidence in a

13

As discussed above, the first San Francisco police officer to encounter Deegan was Johnson, who was at the campsite with Park Ranger Schmaltz, whom Deegan had already assaulted, when Deegan suddenly came out from behind a tree with a "log" in his hand. He ignored Johnson's order to "[s]top" and "drop that," and instead advanced toward Johnson raising the log in the air. Johnson became concerned about protecting Schmaltz, who was unarmed. Deegan's actions forced Johnson to back up and look for cover, while "looking for an out" by which to avoid having to shoot Deegan to protect Schmaltz and himself. This alone is substantial evidence that Deegan's resistance with force or threats were directed toward a peace officer other than Carrasco.

But there is more. Heppler was the second officer to encounter Deegan. Deegan ignored Heppler's shouted directives to " 'Get on the ground.' " and " 'Drop it.' 'Drop it.' 'San Francisco Police.' 'Don't make me shoot you.' " He advanced downhill toward Heppler with the stick in his hand. Despite having multiple "avenues . . . to get away" from the officers, Deegan continued to advance toward them, alternating between Heppler and Carrasco, and then advanced toward Heppler while Carrasco maneuvered to get in a position uphill from Deegan and divert his attention from Heppler. By the time Johnson arrived at the scene, he found Carrasco *and Heppler* "on the ground engaged in . . . a struggle" with Deegan, who was "violently trying to resist, you know, giving up his arms," and "flailing wildly." Carrasco was "on top of him, trying to, you know, pry his arms away," and "Officer Heppler was in there, too, trying to, you know, pull an arm out." It took "a good 30 seconds more" after Johnson arrived and "jumped in" to assist the others before they were able to handcuff Deegan.

---

light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312–1313; accord, *People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) "The court's findings may be either express or implied from the court's ruling." (*Tarris*, at p. 626; *People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585 [similar]; see also *People v. Centers*, *supra*, 73 Cal.App.4th at p. 101 [applying substantial evidence standard in reviewing trial court's application of multiple-victim exception].)

In short, the evidence as to either Johnson or Heppler alone would suffice to support the trial court's finding that there were multiple victims of Deegan's crime of resistance with force or threats. Together, the evidence is more than sufficient.

## III.

### *Divisibility of Count II and Count III Offenses*

Since there was sufficient evidence to support application of the multiple-victim exception, we will affirm the sentencing decision on that basis. We therefore need not discuss the parties' contentions as to whether Deegan's resistance and assault offenses against Carrasco alone were an indivisible course of conduct.

## IV.

### *Applicability of* **Apprendi**

Deegan further argues that any finding by the trial judge that there were multiple victims to support imposition of multiple punishments for counts II and III was constitutionally barred by *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*). *Apprendi* " 'established that a defendant has a federal constitutional right to a jury trial on sentence enhancements . . . . [Citations.]' [Citation.] [It] established the rule that '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' ([*Apprendi*,] *supra*, 530 U.S. at p. 490.)" (*In re Gomez* (2009) 45 Cal.4th 650, 656–657.)

We must address this issue because we agree with Deegan that, given the instructions (even apart from the trial court's comment during defense counsel's closing argument), the jury could have convicted Deegan of resistance with force based on his acts directed at Carrasco alone and was not required to decide whether he resisted more than one officer. Although the verdict, which speaks in terms of "peace officers," tends to indicate the jury found resistance against at least one other officer, the instructions did not preclude it from resting its verdict on Deegan's acts against Carrasco alone, even if the evidence strongly supported a conviction based on his conduct toward all three officers. Thus, if Deegan were correct that the jury was required to make the findings

15

under section 654, arguably the court's sentencing decision cannot stand unless any error resulting from it is harmless.

But Deegan is not correct. As the People, relying on *People v. Cleveland* (2001) 87 Cal.App.4th 263 (*Cleveland*), argue, *Apprendi* does not apply to determinations made by a trial court under section 654 because that statute entails sentencing reduction rather than a sentencing enhancement.

In *Cleveland*, and in *People v. Solis* (2001) 90 Cal.App.4th 1002 (*Solis*), the Second District Court of Appeal held that *Apprendi* does not require a jury to make the factual findings that determine whether the trial court will stay sentences under Penal Code section 654 on one or more of multiple convictions. In *People v. Black* (2005) 35 Cal.4th 1238, 1264 (*Black I*), cert. granted, judgment vacated *sub nom. Black v. California* (2007) 549 U.S. 1190, abrogated by *Cunningham v. California* (2007) 549 U.S. 270) the California Supreme Court adopted the holdings in *Cleveland* and *Solis*. The court addressed "whether a defendant is constitutionally entitled to a jury trial on the aggravating factors that justify an upper term sentence or a consecutive sentence." (*Black I*, at p. 1244.) The court answered both questions in the negative. (*Id*. at p. 1264.) It observed that "numerous cases held that *Apprendi* does not apply to the decision to impose consecutive sentences" and, moreover, that "California cases held that *Apprendi* does not apply to the factual determinations made by the trial judge in connection with the decision whether to stay sentences on particular counts under the provisions of Penal Code section 654 prohibiting multiple punishment." (*Id*. at pp. 1263–1264, citing *Cleveland* and *Solis*.)

In *Cunningham v. California*, *supra*, 549 U.S. 270, the United States Supreme Court held that California's determinate sentencing law violated *Apprendi* to the extent it allowed a defendant, for whom the statutory maximum term would otherwise be the middle term, to have his sentence be increased to the upper term based solely on a fact or

16

facts found by the trial judge rather than by the jury. (*Id*. at p. 293.)[5] On remand for reconsideration in light of *Cunningham*, the California Supreme Court issued *People v. Black* (2007) 41 Cal.4th 799 (*Black II*). In that opinion, the court reaffirmed its prior holding that imposition of consecutive terms does not implicate a defendant's Sixth Amendment rights, concluding that *Cunningham* did not address or undermine that holding. (*Id*. at p. 821.)[6] While *Black II* did not again cite *Cleveland* or *Solis* or mention section 654, neither did it suggest any retreat from its dictum in *Black I* to the effect that section 654 poses no Sixth Amendment problem.

Two years after *Black II*, the United States Supreme Court upheld an Oregon statute governing concurrent and consecutive sentencing. (*Oregon v. Ice* (2009) 555 U.S. 160.) The statute provided that sentences were to run concurrently unless the judge found certain facts, in which case the judge was permitted to impose consecutive sentences. (*Id*. at p. 165.) Specifically, if the judge found the defendant's offenses did not arise from the same course of conduct, she could impose a consecutive sentence. (*Ibid*.) Alternatively, she could do so if she found the offense indicated a willingness to commit more than one offense or caused or created a risk of greater or different harm to the victim or to a different victim. (*Ibid*.) The court distinguished its earlier cases applying *Apprendi* to sentencing laws[7] as "involv[ing] sentencing for a discrete crime,

---

     **5** The Legislature subsequently amended the Determinate Sentencing Law in response to *Cunningham*. (*People v. Sandoval* (2007) 41 Cal.App.4th 825, 836, fn. 2.)

     **6** In *Black II*, the court also held that under United States Supreme Court precedents, including *Cunningham*, where the defendant "is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury. 'Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.' " (*Black II*, *supra*, 41 Cal.4th at p. 813.)

     **7** These cases, besides *Cunningham*, are *Ring v. Arizona* (2002) 536 U.S. 584 (applying *Apprendi* rule to facts subjecting defendant to death penalty), *Blakely v.*

17

not—as here—for multiple offenses different in character or committed at different times." (*Oregon v. Ice*, at p. 167.) The court declined to extend *Apprendi* "to the imposition of sentences for [multiple] discrete crimes" based on the "twin considerations" of "historical practice" (that under common law the "regime for administering multiple sentences has long been considered the prerogative of state legislatures") and "respect for state sovereignty" (that "administration of a discrete criminal justice system is among the basic sovereign prerogatives States retain"). (*Oregon v. Ice*, at pp. 161, 168.) Oregon's statute, unlike common law and many other states' statutes, imposed limits on trial courts' discretion by requiring the judge to make certain factual findings before a consecutive sentence could be imposed. (See *id.* at pp. 164, 170.) In the Supreme Court's view, this did not compel the conclusion that *Apprendi* applied. Further, the court observed that the factfinding required under Oregon's statute was beneficial: "Limiting judicial discretion to impose consecutive sentences serves the 'salutary objectives' of promoting sentences proportionate to the 'gravity of the offense,' [citation], and of reducing disparities in sentence length." (*Oregon v. Ice*, at p. 171.) It also considered that a holding applying *Apprendi* to such statutes would "be difficult for States to administer. The predicate facts for consecutive sentences could substantially prejudice the defense at the guilt phase of a trial. As a result, bifurcated or trifurcated trials might often prove necessary." (*Oregon v. Ice*, at p. 172.)

These authorities lead us to conclude neither the California Supreme Court nor the United States Supreme Court would hold *Apprendi* applies to trial courts' findings of facts under section 654. First, we agree with our Fifth District colleagues that *Black I* states the law of California with respect to the Sixth Amendment and findings of fact for purposes of applying section 654. (See *People v. Morelos* (2008) 168 Cal.App.4th 758,

---

*Washington* (2004) 542 U.S. 296 (facts allowing sentence exceeding "standard" range), and *United States v. Booker* (2005) 543 U.S. 220 (facts prompting elevated sentence under mandatory federal sentencing guidelines). (See *Oregon v. Ice*, *supra*, 555 U.S. at p. 167.)

18

770 [holding *Black I* obliged it to reject Sixth Amendment challenge to trial court finding under section 654 that multiple crimes did not arise from indivisible transaction].)

Second, while *Oregon v. Ice* involved a consecutive/concurrent sentencing scheme, its analysis supports the holdings in *Cleveland* and *Solis* and the dictum in *Black I.* We so conclude because both section 654 and the statute the court upheld in *Oregon v. Ice* deal with sentencing for multiple offenses rather than sentencing for a single discrete crime—a factor that was key to the Supreme Court's decision. (See *Oregon v. Ice*, *supra*, 555 U.S. at pp. 167, 168 [distinguishing *Apprendi* and its progeny "involv[ing] sentencing for a discrete crime, not—as here—for multiple offenses different in character or committed at different times"].) Both address sentencing functions in which the jury traditionally has played no part. (*Oregon v. Ice*, at pp. 163, 168 [specification of regime for administering multiple sentences has long been considered prerogative of state legislatures; see also *People v. Benson* (1998) 18 Cal.4th 24, 38 (dis. opn. of Chin, J.) [discussing history of section 654].)[8] Both limit a trial court's discretion by requiring judicial factfinding, and the facts the court is required to find are similar.[9] And finally, while the Oregon statute involved a decision whether to sentence consecutively or concurrently, and section 654 involves imposing a stay of

---

[8] Section 654 was adopted by the California Legislature in 1872. Its application has been treated as the province of judges, not juries. (See, e.g., *People v. Koehn* (1929) 207 Cal. 605, 613 [court held it was proper to submit two counts to jury, but not to convict defendant of both, and so set aside judgment on one]; *People v. Coltrin* (1936) 5 Cal.2d 649, 659–663 [rejecting challenge to trial court's sentencing on multiple counts under section 654], overruled on other grounds in *People v. Brown* (1958) 49 Cal.2d 577, 592–593; *Brown*, at p. 580 [holding judgment on second count should be reversed because permitting convictions on both counts would violate section 654].)

[9] The Oregon statute made the sentencing decision turn on whether the judge found the offenses arose from the same course of conduct, reflected a willingness to commit multiple crimes and posed additional risk of harm to additional victims. The inquiry under section 654 is similar: the trial court considers (1) whether the offenses were part of a single course of conduct, which in turn requires consideration whether they were directed to a single objective; and (2) whether the offenses had multiple victims. (See pp. 8–9, *ante*.)

19

execution of a sentence, the latter is a judicially devised remedy[10] that is similar in practical effect to concurrent sentencing. (See *People v. Jones* (2012) 54 Cal.4th 350, 353 [noting "little practical difference between imposing concurrent sentences . . . and staying sentence"]).

## DISPOSITION

We conclude there is substantial evidence to support the trial court's application of the multiple-victim exception to Deegan's sentencing and the trial court did not violate Deegan's Sixth Amendment rights by making findings of fact on that issue. We therefore affirm.

---

[10] Concurrent sentencing was once employed by some California courts as a means for enforcing the dual punishment proscription in section 654, but was later rejected, first in favor of partially reversing the judgment and ultimately in favor of staying the sentence for the lower term. (See *In re Wright* (1967) 65 Cal.2d 650; *In re Adams* (1975) 14 Cal.3d 629, 636–637.)

_____
                         STEWART, J.

We concur.

_____
RICHMAN, Acting P.J.

_____
MILLER, J.

*People v. Deegan* (A143344)

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Jerome T. Benson

Counsel:

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Acting Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, Leif M. Dautch, Deputy Attorney General, for Plaintiff and Respondent.