Filed 11/15/22  P. v. Keys CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LEON LEE KEYS,<br><br>        Defendant and Appellant. | A162153<br><br>(Contra Costa County<br>Super. Ct. No. 5-200773-0) |

On the morning of April 14, 2020, defendant Leon Lee Keys restrained Jane Doe in her bedroom, and later that day, while driving her car, he placed her in a headlock, grabbed her hair, and punched her repeatedly as she tried to exit the vehicle.  Keys was convicted by a jury of attempted kidnapping, battery, and false imprisonment, and sentenced separately and concurrently on each count.  He argues that because each conviction was based on the same act and the same criminal intent, Penal Code section 654[1] requires that sentence on two of the three counts be stayed.  We disagree, and we affirm.

**BACKGROUND**

On October 28, 2020, the Contra Costa County District Attorney filed an amended information charging Keys with attempted kidnapping (§§ 207, subd. (a) & 664) (count 1), corporal injury on a person with whom he had a

---

[1] Further undesignated statutory references are to the Penal Code.

1

dating relationship (§ 273.5, subd. (a)) (count 2), false imprisonment by violence (§§ 236 & 237) (count 3), taking a vehicle without consent (Veh. Code, § 10851, subd. (a)) (count 4), disobeying a court order (§ 166, subd. (c)(1)) (count 5), and battery on a person with whom he had a dating relationship (§ 243, subd. (e)(1)) (count 6).[2] Counts 1 through 5 involved incidents involving Jane Doe that occurred "on or about April 14, 2020." Count 6 involved an incident involving Jane Doe that occurred on December 3, 2019.

Jane Doe testified at trial under subpoena, but refused to meaningfully answer questions, repeatedly responding "I have nothing to say" and "I don't know." To prove its case, the prosecution relied on Doe's statement to Officer Jonathan Ma on April 14, 2020 as recorded by his body camera, and on a recorded phone interview with Doe on April 16, conducted by Concord Police Detective Andrew Demott.

Officer Ma testified regarding Doe's statements about the incident on the morning of April 14:

"Q. What did she say happened on the morning of April the 14th?

"A. So when she returned home—so she left, as well, on the 13th, and then when she returned home on the 14th, at approximately 8:00 in the morning, um, Keys was at her residence waiting for her, and then he did not allow her to leave her room. Um, and then at times when she tried to leave her room he would stand in front of her doorway and physically block her from leaving. And then at one point she told Keys that she wanted to use the restroom, he gave her a bottle and told her to use that instead."

---

[2] Because Keys' arguments on appeal all relate to counts 1, 2, and 3, we do not describe the factual bases for the remaining counts.

Doe also described the incident on the morning of April 14 in her phone interview with Detective Demott:

"So I left, um, you know, just grabbed some clothes and stuff, um, and went and got a motel room. And, um, I came back the next morning, um, hoping he was gone. Didn't really figure he would have been, but, um, I—I had nowhere else to go, you know I had to go home. And, so, I came back home and he was being, you know, nice and, you know, he's sorry and blah, blah, blah, same shit as always. And, um, so I was just exhausted. I laid down and watching a movie and all of a sudden he just like started asking questions like—like, so who were you with us [*sic*] night? Where did you go, you know, and just started being him again. The shitty him that I didn't know existed until this started happening. Um, when it was getting to the point where he didn't want me to get up and go to the bathroom, like, um, he at one point peed in a bottle and told me I didn't have to leave the room to go to the bathroom. I could do what he just did. And I was like, 'Oh, no. Like, what the hell?' And he would like stand in front of me if I tried to leave the bedroom. And I was like, 'Bro, like, you obviously know that if anybody in the house is worried about me they're going to call the police because they don't really trust you.'"

Officer Ma's interview with Doe also described an incident on the evening of April 14, in which Keys and Doe were in her car, with Keys driving, waiting for her brother Robert to visit a friend. When Keys became impatient for Robert to return, he told Doe that they were leaving and the two got into an argument. And then:

"[Doe:] Thank you. Um, so—so he's telling me how he's gonna kidnap me and he's gonna take me and, um, basically it all just happened so fast. I knew that he was gonna—he was reaching for me so I threw my purse out

3

the window and tried to take off my seat belt and open the door at the same time, and he just grabbed me by my head and was holding my hair, pulling my hair, and just punching me on the side of the face and the side of my ear, and—and I was just trying to get away from him. I was scratching him, biting him, anything I could do to get him off me, and he just kept punching and punching and trying to pull my neck back and . . . and some—some guy ran up—'cause he was driving the whole time, and I was I was keeping the door open with my leg and it—I reached down and tried to put it in park because he was just on the gas, and I got it in park, so the car jerked and some guy ran up and started banging on the window and was like, 'Stop. Leave her alone. Leave her alone. You can't do that,' and it distracted him enough to where I could slip away from him, and he was trying to take off while I was getting out, and—but I was able to get out, and the guy was just like, 'Run. Run,' and he was banging on the windows again telling him to stop, and I just fuckin' ran, and my purse was, you know, I grabbed my purse off the ground and put everything back in it and I just ran and thankfully they just opened their door and was like, 'Come in. Come in.' "

Doe described the incident in the car again in her phone interview with Detective Demott:

"And, um, so I took my purse and as he was putting it in drive I threw my purse out the window and just tried to unbuckle my seat belt and open the door as fast as I could to get out. And he grabbed me, um, by my hair and, like, pulled my head all the way down to where it was like damn near on his lap. And he just started full force punching me in the side of the head, um, and anywhere he could make contact he just was with everything he had punching and punching, punching. And, so I was able to get the door open. So I was holding the door open with my foot and trying to pull away from

4

him.  And he had—he had a pretty tight grip on me.  So, I was trying to scratch by anything I could to get him off me.  And—and he just—the more I tried the harder he hit and pulled and, um, I was able to, um, get the car and to put the car back in park because the whole time he was driving, like, as fast as he could.  And, like, just so we were spinning around in circles.  And I don't know if we hit anything or I don't know how we even—cause it's not a big area in there.  But he was driving the whole time.  And, so, I was trying to get the car back in the park.  I was trying to pull the steering wheel anything I could and, um, he just kept hitting me and somebody—at some—I did get the car back in park.  So, when I got to in park, somebody came and was—started pounding on the driver's side window.  And I was screaming as loud as I could the whole time.  Um, so somebody started pounding on the window and was like—like, 'Hey, stop.  Leave her alone.  Stop.'  And, um, I guess the—me putting it in park and while we're driving, so, you know, we jerked.  Um, went into the park and then—and then the person slamming on the window or banging on the window must have distracted him enough to where he just loosened his grip a little bit.  And, so I was able to slide out of the car halfway, um, but he grabbed me again by my hair and just pulled me back in.  And I just pulled back as hard as I could and, kind of, just threw myself out of the car and I was able to get out."

On November 12, a jury found Keys guilty on all counts except for count 2, on which the jury found him guilty of the lesser included offense of battery on a person with whom he had a dating relationship (§ 243, subd. (e)(1)).  The trial court then found true enhancements for a prior serious or violent felony (§§ 667, subds. (d) & (e), & 1170.12, subds. (b) & (c)) and a prior serious felony (§ 667, subd. (a)(1)).

5

On February 26, 2021, the trial court sentenced Keys to five years in prison—the 30-month midterm for the attempted kidnapping (count 1), doubled to five years because of the prior strike. The trial court sentenced Keys to two years each on counts 3 and 4, and one year each on counts 2, 5, and 6, all to run concurrently to the sentence on count 1. The trial court also stayed the five-year enhancement under section 667, subdivision (a)(1).

Keys filed a notice of appeal.

## DISCUSSION

Keys argues that the same act and intent formed the basis of his convictions on the attempted kidnapping, battery (count 2), and false imprisonment counts, so that sentence on two of those counts must be stayed under section 654. The Attorney General argues that the attempted kidnapping and battery counts are distinct for the purposes of section 654, but concedes that if the jury based the false imprisonment conviction on the events in the car on the evening of April 14, section 654 would apply to that count. However, the Attorney General argues that the trial court could have found that the false imprisonment conviction was based on the events of the morning of April 14, and thus section 654 does not apply. On reply, Keys argues that the jury necessarily convicted him of false imprisonment based on the incident in the car, such that section 654 applies to the attempted kidnapping and false imprisonment counts.

**The Trial Court Properly Concluded Section 654 Did Not Apply to the Attempted Kidnapping and Battery Counts**

**Applicable Law**

We distilled the applicable law in *People v. Deegan* (2016) 247 Cal.App.4th 532:

" ' "In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." ' " ' (*People v. Correa* (2012) 54 Cal.4th 331, 337; see § 954.) 'Section 654 bars separate punishment for multiple offenses arising out of a single, indivisible course of action.' (*People v. Neely* (2009) 176 Cal.App.4th 787, 800.) Its purpose is 'to ensure that a defendant's punishment will be commensurate with his culpability.' (*Correa,* at p. 341.)

" ' "If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative." (*People v. Knowles* (1950) 35 Cal.2d 175, 187.) [¶] The "singleness of the act," however, is no longer the sole test of the applicability of section 654. " 'Section 654 has been applied not only where there was but one "act" in the ordinary sense . . . but also where a course of conduct violated more than one statute . . . within the meaning of section 654.' [*People v. Brown* (1958) 49 Cal.2d 577, 591.] [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more

7

than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; italics added.)' (*People v. Beamon* (1973) 8 Cal.3d 625, 637, fn. omitted, disapproved on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896.)" (*People v. Deegan, supra*, 247 Cal.App.4th at pp. 541–542.)

"Whether multiple convictions are based upon a single act is determined by examining the facts of the case." (*People v. Mesa* (2012) 54 Cal.4th 191, 196.) Intent and objective are also "factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) A trial court's imposition of multiple sentences must be sustained on appeal so long as its factual findings, express or implied, of multiple acts or multiple intents and objectives are supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731; *People v. Cruz* (2020) 46 Cal.App.5th 715, 737.) Accordingly, we review the trial court's imposition of multiple sentences " 'in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

If the trial court does not stay a sentence pursuant to section 654, and offers no factual basis for its decision, we presume the court found that the defendant harbored a separate intent and objective for each offense. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1147.) Here, there was no discussion at sentencing of section 654. Accordingly, we must affirm the sentence if an implied finding that section 654 does not apply is supported by substantial evidence. (See *People v. Osband, supra*, 13 Cal.4th at pp. 730–731.)

**Analysis**

Keys argues that the same act—his "forceful struggle to keep Doe in the car"—forms the basis for his conviction on each of the attempted kidnapping, battery, and false imprisonment counts.

As noted, the Attorney General concedes that section 654 would apply to the attempted kidnapping and false imprisonment counts if the false imprisonment count was based on the incident in the car, but argues that the trial court could have found the false imprisonment count was based on Keys restraining Doe in the morning of April 14, an argument we consider in the next section. We thus first consider whether section 654 applies to the attempted kidnapping and battery charges, concluding that it does not.

The attempted kidnapping charge required the prosecution to prove, in relevant part, that Keys "took a direct but ineffective step toward committing a kidnapping," which in turn required that Keys "took, held, or detained another person by using force or by instilling reasonable fear" and "[u]sing that force or fear . . . moved the other person or made the other person move a substantial distance," whereas the battery conviction required that Keys "willfully touched Jane Doe . . . in a harmful or offensive manner."[3]

The trial court could permissibly conclude that separate acts underly the convictions for attempted kidnapping and battery for the purposes of section 654. In particular, the trial court could conclude that Keys committed the attempted kidnapping by putting Doe in a headlock and grabbing her hair while continuing to drive, and that he committed the battery by

---

[3] The infliction of injury on someone with whom defendant had a dating relationship charge contained the further requirement that the touching resulted in a "traumatic condition," an element the jury apparently concluded had not been proven beyond a reasonable doubt given its not guilty verdict on that offense.

9

repeatedly punching her. Indeed, in closing, the prosecutor argued that Keys detained Doe using force by "put[ting] her in a headlock when she was trying to jump out of the car," and committed infliction of injury on someone with whom he had a dating relationship by repeatedly punching her. Unlike placing Doe in a headlock or grabbing her hair, repeatedly punching her was not a means of restraining her in the car. (See *People v. Nubla* (1999) 74 Cal.App.4th 719, 730–731 [section 654 does not apply to two offenses where first offense "not done as a means of" accomplishing second offense, "did not facilitate that offense and was not incidental to that offense"].)

Nor did the evidence compel the conclusion that Keys' only intent was to "keep Doe in the car with him against her will." As noted, while holding Doe by the hair and placing her in a headlock while driving the car forward served to restrain Doe in the car, punching her repeatedly did not. The trial court could permissibly conclude that Keys had a separate criminal intent with respect to count 2, for example, to frighten Doe or to punish her for attempting to escape. Substantial evidence thus supports the trial court's implied finding that counts 1 and 2 were separate for the purposes of section 654.

*People v. Corpening* (2016) 2 Cal.5th 307, relied on by Keys, is inapposite. There, the victim had loaded $70,000 in valuable coins into his van when the defendant approached pointing a gun and said " 'Get out of the car or I'll shoot you.' " (*Id*. at p. 309.) The victim got out of the van and the defendant got in, and they twice struggled for the gun. (*Ibid*.) The defendant "quickly threw the vehicle into reverse gear and began pulling away," and the victim "grabbed onto the steering wheel [and] was dragged approximately 18 feet down the driveway before he lost his grip and fell to the pavement."

(*Ibid*.)  The defendant was later convicted of both carjacking (§ 215, subd. (a)) and robbery (§ 211).  (*Id*. at p. 310.)

*Corpening* held that sentence on one of the counts must be stayed, because the defendant's "forceful taking of [the victim's] van was a single physical act for purposes of section 654 because that act simultaneously accomplished the actus reus" for the robbery and carjacking, which required taking another's personal property (the coins) by force and taking another's vehicle by force, respectively.  (*People v. Corpening*, *supra*, 2 Cal.5th at pp. 314–315.)  But *Corpening* is plainly distinguishable, because in this case separate physical acts accomplished the actus reus for the attempted kidnapping (placing Doe in a headlock and grabbing her hair while causing the vehicle to accelerate) and the battery (repeatedly punching Doe).  Unlike in *Corpening*, here these separate acts *did* "on their own complete[] the actus reus required for the relevant crimes."  (*Id*. at p. 315.)

**The Trial Court Could Find that the False Imprisonment Count Was Based on Restraining Doe in Her Bedroom Such That Section 654 Did Not Apply**

With respect to the attempted kidnapping and false imprisonment counts, the Attorney General concedes that if the jury's false imprisonment verdict was based on the incident in the car, section 654 applies to the sentences on these counts and the case must be remanded for resentencing.  However, the Attorney General argues that because the jury's false imprisonment verdict could have based on Keys restraining Doe in her bedroom on the morning of April 14, section 654 does not apply.  We agree.

**Applicable Law**

Again, *People v. Deegan*, *supra*, 247 Cal.App.4th 532, is apt and explains the general rule:  "Contrary to [defendant]'s argument that the jury must make the relevant findings, the courts have held that 'in the absence of

11

some circumstance "foreclosing" its sentencing discretion . . . , a trial court may base its decision under section 654 on any of the facts that are in evidence at trial, without regard to the verdicts.' (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340.)" (*People v. Deegan*, *supra*, 247 Cal.App.4th at p. 545.) Such a "foreclosing" circumstance has been found where "the prosecution proceeded on a single factual basis at trial, as reflected in the charging documents, jury instructions, prosecutor's arguments, or verdict forms." (*People v. Carter* (2019) 34 Cal.App.5th 831, 842; see *People v. Jones* (2012) 54 Cal.4th 350, 359 [finding prosecution proceeded on single factual basis based on amended information and closing argument].)

**Analysis**

Contrary to Keys' argument, the prosecution here did not proceed on a "single factual basis at trial." Quite the opposite. The operative information alleged that Keys committed the crime of false imprisonment "on or about April 14, 2020," leaving open the possibility that he committed that crime in the morning or in the evening. And the verdict form similarly required the jury to find only that Keys committed false imprisonment "on or about April 14, 2020." The jury instructions were even more express that the prosecution was alleging *two* instances of false imprisonment:

"THE COURT: The defendant is charged with false imprisonment by violence in Count 3, and disobeying a court order in Count 5.

"The People have presented evidence of more than one act for each offense to prove that the defendant committed each of these offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of the acts for each offense and you all agree on which act he committed for each offense."

12

Keys' argument that the prosecution proceeded on a single factual basis at trial relies on portions of the prosecutor's closing argument where he suggested that the jury find Keys guilty of false imprisonment based on his restraining Doe in the car, including stating that doing so would be "the most economical way to do it." But the entire context of the prosecutor's discussion of the false imprisonment charge again makes clear that the prosecution's theory was that there were *two* incidents of false imprisonment, and the jury was free to convict based on either one of them:

"False imprisonment by violence. By violence, Count 3. He did this to her twice. So he did it to her when he confined her in the room earlier in the day. Stepping in front of her whenever she wanted to get out, and given what happened between and before, obviously that was within minutes, with implied threat of force. There is a reason why she wouldn't dare push past him, she knows what he will do. And then later, when he forces her into the car.

"If you, as a jury, find beyond a reasonable doubt—if you all unanimously find beyond a reasonable doubt that he's guilty, that when he was holding her in the car he was guilty of this crime, then you would find her guilty, or find him guilty, excuse me. When you are deliberating about this, just remember, you have to unanimously find regarding the one episode later, or the episode before. But there is just one charge of false imprisonment by violence.

"I think the most economical way to do it, that I would suggest, deliberate however you want, is just think about what happened when he was forcing her in the car, that's on video, and he admitted that he puts her in a headlock as she is trying to get out of the car. He obviously unlawfully restrains, confines, or detained her, and he made her stay or go somewhere

13

against her will.  He made her stay in the car.  He made her go as the car was going.  And that's clearly when you heard her screaming.

"So you don't have to figure out what happened before they showed up at that apartment area in Concord.  You don't have to decide one way or the other whether or not he confined her in the room, or what happened the day before that.  To figure out all of the counts for the April incident, you can get there just considering what happened as he forced her to stay in the car while he tried to kidnap her.  And I hope that's good news for you, because while he did falsely imprison her twice, there's only one charge.  And after you, if you conclude unanimously that he falsely imprisoned her when he was forcing her to stay in the car, find him guilty of Count 3 and move on."

In short, the charging documents, jury instructions, prosecutor's arguments, and verdict forms all make clear that the prosecution proceeded on two factual bases at trial with respect to the false imprisonment charge—that Keys committed the crime both in the morning and the evening of April 14, 2020.  The trial court was thus free to base its sentencing discretion on any of the facts in evidence at trial, including the evidence supporting the conclusion that Keys committed false imprisonment in the morning of April 14, and that therefore section 654 did not require staying the sentence on that count.

## DISPOSITION

The judgment is affirmed.

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*People v. Keys* (A162153)

15