Filed 7/29/21  P. v. Maden CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRAYNELL NATRON MADEN et al.,<br><br>    Defendants and Appellants. | B302115<br><br>(Los Angeles County Super. Ct. No. MA069855)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 1, 2021, be modified as follows:

1.  On page 9, fourth sentence of the second full paragraph, the language "and a video of the scene that was of poor quality and on which it was 'hard to see anything' " is added so the sentence reads:

The only evidence associating him with any firearm was the gunshot residue on his hands, his sister's statement after the murder that she "got his piece," and a video of the scene that was of poor quality and on which it was "hard to see anything."

2. On page 9, fifth sentence of the second full paragraph, the word "touched" is changed to "fired" so the sentence reads:

This evidence indicated at most that Penn had recently fired a gun; nothing tied any such gun use to the Halloween party or his murder.

3. On page 12, the entire first paragraph is replaced with the following:

Regarding the surveillance video, which we have viewed, the court noted that the enhanced video "actually added something," but "was vague at best." The court stated, "On the left side you see a person whose shirt is brighter than the rest. That person starts going from left to right and ultimately goes past everyone. And then you see, who I think is probably the victim—and the reason I say that is there are two people that when you see the muzzle flashes, they drop and then they disappear. Arguably those are the people that get into the car, which arguably then would be Destiny and the victim. And these are arguable points. It is not definitive. But what you see is you see presumably the victim raise his hand and then you see a muzzle flash."

The court stated, "the first time I saw that I thought, well, that seems to be pretty good evidence that [Penn] fired the gun.  And I think that's where the assumptions start coming in.  I watched it over and over and over again and what you see is the following:  You see—if we are correct, you see the victim raising his hand.  There is another gentleman standing right in front of him and he also seems to be doing something with his hand and then you see a muzzle flash.  But the muzzle flash, if you look at it over and over and over again, seems to be right in the middle between both of them.  At first I assumed it came from the victim but when you look enough times, I could not tell where the muzzle flash came from.  It seems to have come from somewhere in between two people.  [¶] And then the arguable point is this:  Look, the shooter, Mr. Matthews, pulled out a gun, the victim in a defensive reflection put his hands out, and then you see the muzzle flash.  That is a very arguable position.  And when you couple that with Destiny and Arlen, who were very credible, was it probable that there would be a different verdict?  I don't think we have met that standard."

4.  On page 12, the second full paragraph beginning with "The court commented" is deleted in its entirety.

5.  On page 15, the first full paragraph beginning with "Here, the record is silent" is deleted in its entirety.

6.  On page 15, the following language is added after the last full paragraph:

Appellants argue that a new result was reasonably probable because, as the court observed, the enhanced video "added something," and was "pretty good evidence that [Penn] fired a gun," and that this was an "arguable point." We disagree.

First, that the enhancement "added something" is an immaterial tautology; the question is whether the addition made a different result reasonably probable. Second, the court did not find the enhanced video to be "pretty good evidence" that Penn fired a gun. It stated, "*the first time I saw [the video] I thought*, well, that seems to be pretty good evidence that [Penn] fired the gun," but ultimately concluded it was not good evidence of that fact. The court's ultimate finding superceded its initial musings.

Third, the court did not find the issue of whether Penn fired a gun to be an arguable point. It found the enhanced video to be so vague that whether it even depicted *Matthews* firing a gun was an arguable point. Appellants argue that the court repeatedly acknowledged that it was "arguable" that the video could support either the defense or the prosecution narratives. They are incorrect. The court's only comments in this vein were "arguable" that the video could support even the prosecution narrative.

There is no change in the judgment.

Appellants' petition for rehearing is denied.

_____

CHANEY, J.          BENDIX, Acting P. J.          FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRAYNELL NATRON MADEN et al.,<br><br>    Defendants and Appellants. | B302115<br><br>(Los Angeles County Super. Ct. No. MA069855) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Affirmed with directions.

Law Office of Steven Schorr, Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Traynell Maden.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Patrick Matthews.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Traynell Maden of first degree murder and second degree robbery and found gang allegations to be true. The jury convicted Patrick Matthews of second degree murder and a possession count and found gang, gun, recidivism, and violent felony allegations to be true. The trial court sentenced appellants to long prison terms.

Appellants contend (1) the trial court erred in denying a request for instructions on self-defense and voluntary manslaughter, (2) the trial court erred in denying a motion for new trial, (3) counsel was ineffective for failing to enhance video evidence and locate two witnesses, (4) the trial court erred in denying motions to unseal juror information, (5) Matthews's sentence for gun possession should have been stayed under Penal Code section 654, and (6) the one-year enhancement he received should be stricken.

We agree with the last point but reject the others, and thus affirm the conviction with directions to strike Matthews's one-year enhancement.

## BACKGROUND

On October 29, 2016, appellants, members of the Pasadena Denver Lane (PDL) Bloods gang, confronted Jerry Penn, a former member of the Compton Crips, at a Halloween Party in Lancaster. Maden yanked gold chains from Penn's neck and told

2

Matthews to shoot him, whereupon Matthews shot Penn several times.

When the shooting stopped, Penn was able to make it into a car with his sister, Destiny, and her boyfriend, Arlen Carter, and they drove away in the direction of Destiny's house. After about a mile, Destiny lost control of the car and crashed it into a curb near her house. Carter pulled Penn from the car, ran down the street to get Penn and Destiny's mother, and returned with her in a car. When her mother arrived, Destiny screamed, "Don't worry, Mom. I got his piece." Penn died at the scene. No gun belonging to him was ever recovered.

A video surveillance camera located across the street from the Halloween party more or less captured the incident, with poor resolution.

Both appellants were identified by witnesses—although not always consistently—during the police investigation, preliminary hearing, and trial, and cell phone evidence at trial placed Matthews's phone in the vicinity of the party.

At trial, Destiny and Carter, were the prosecution's main witnesses. Destiny testified that Matthews, whom she knew, approached to within approximately a foot of her and Penn, holding a black semi-automatic handgun. She placed herself between Penn and Matthews, knelt on the ground, and told Matthews, "This is my brother," "put up your gun. Put up your gun," and repeated, "no." Carter also placed himself between Penn and Matthews, told Matthews, "Put the gun up," and asked, "What's the problem?"

Destiny and Carter testified that Maden snatched two gold chains that were around Penn's neck, then ran away.

They saw Matthews, who was approximately "an arm length" to three or four feet away, raise his gun and shoot Penn. They then dropped to the ground and heard additional gunshots.

Penn died from a gunshot wound through the heart.

Appellants' defense was mistaken identity, based on (1) several witnesses' purported willingness to fabricate testimony against a rival gang, (2) there being pandemonium in the immediate aftermath of the shooting, and (3) there being no soot or stippling on Penn's body, indicating the actual shooter was farther away than Matthews's purported three or four feet.

Other trial proceedings will be described below as they become relevant.

The jury convicted appellants, and the court sentenced Matthews to 55 years to life plus eight years, comprising 30 years to life for the murder, 25 years to life for the gun enhancement, three years on the possession count, four years for the gang enhancement, and one year for having suffered a prior conviction. The court sentenced Maden to 25 years to life, plus 15 years, comprising 25 years to life for the murder, five years for the robbery, and 10 years for the gang/violent felony enhancement.

The court denied appellants' motions for new trial.

## DISCUSSION

### A.    Instructions on Voluntary Manslaughter

Appellants contend the trial court erred in refusing to instruct on self-defense, heat of passion, and voluntary manslaughter. We disagree.

#### 1.    Relevant Proceedings

There was evidence at trial that Penn had gunshot residue on his hands when he died, and that his sister told their mother,

4

"don't worry mom, I got his piece" in the aftermath of the shooting.

Matthews's attorney argued to the jury that a surveillance video of the incident showed Penn firing a weapon "southwards" before himself being shot "from someone north." But attorney argument is not evidence, and in any event the trial court stated that the video was of such poor quality that it was "hard to see anything." The only actual evidence characterizing the video was the testimony of Los Angeles County Sheriff's Detective Gail Durham, who stated it depicted "the shooting area" but not "the shooting itself."

Although when discussing possible jury instructions both appellants' trial attorneys affirmatively represented they would assert no defenses based on self-defense or voluntary manslaughter, they nevertheless ultimately requested a self-defense instruction, arguing the gunshot residue on Penn's hands suggested he "was the shooter initially and that someone responded in self-defense."

The court refused to give the instruction, finding the gunshot residue evidence was insufficient to support them because it could have been caused by reasons other than Penn firing a weapon. The court found that "[a]side from that one bare piece of evidence, there was no" evidence to indicate Penn "showed any aggression," nor any that appellants "had the actual but unreasonable belief" that "they had to defend themselves" or actually were defending themselves at the time of the shooting. No one testified that Penn had a gun at the party, for example. Although there was testimony that Destiny Penn told her mother that she "got" Penn's "piece" after the fact, in a different location, nothing indicated he had a gun in hand during the shooting.

However, the court instructed the jury with CALJIC No. 8.73, which stated that if there was "provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter," the jury should "consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

## 2. Legal Principles

A trial court must instruct on general principles of law relevant to the issues raised in a criminal case. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) The trial court must sua sponte instruct on a defense "if it appears that the [appellant] is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the [appellant's] theory of the case." (*People v. Maury* (2003) 30 Cal.4th 342, 424.) Substantial evidence is that which, if believed, would be sufficient for a jury to find a reasonable doubt as to defendant's guilt. (*People v. Michaels* (2002) 28 Cal.4th 486, 529; *People v. Salas* (2006) 37 Cal.4th 967, 982-983.)

" 'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, fn. 5.) A trial court errs if it fails to instruct "on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Id*. at p. 162.) The "existence of '*any* evidence, no matter how weak' will not justify

6

instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude" ' that the lesser offense, but not the greater, was committed."  (*Ibid.*)

"We review de novo a trial court's failure to instruct on a lesser included offense," viewing the evidence "in the light most favorable to the defendant."  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Homicide is divided into murder, which requires malice aforethought, and manslaughter, which does not.  (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)

A killing without malice but induced by a sudden quarrel or heat of passion is voluntary manslaughter, a lesser included offense of murder.  (*People v. Williams* (1988) 199 Cal.App.3d 469, 475.)

Voluntary manslaughter on a heat of passion theory has both subjective and objective components.  (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  "To satisfy the subjective element . . . , the accused must be shown to have killed while under 'the actual influence of a strong passion' " induced by the victim's provocation.  (*Id.* at p. 550.)  The passion aroused may be any " ' " 'violent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge."  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.)

To satisfy the objective element, the heat of passion must be a result of sufficient provocation—that is, conduct by the victim "sufficiently provocative that it would cause an ordinary

person of average disposition to act rashly or without due deliberation and reflection." (*People v. Moye*, *supra*, 47 Cal.4th at pp. 549-550.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 949.) Both heat of passion and adequate provocation "must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

Malice aforethought may also be negated by an actual but unreasonable belief in the need to defend oneself or another from imminent danger of death or great bodily injury, reducing a killing from murder to voluntary manslaughter. (*People v. Randle* (2005) 35 Cal.4th 987, 990, 994, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) This doctrine is commonly known as imperfect self-defense or defense of another. (*Randle*, at p. 994.)

Self-defense against an assault requires an actual and reasonable belief in the need to defend against an imminent danger of bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) The trier of fact "must consider what 'would appear to be necessary to a reasonable person' " in the position of appellant, with the appellant's knowledge and awareness. (*Id.* at pp. 1082-1083.) CALCRIM No. 3470 provides in pertinent part that a defendant acts in lawful defense of another and is not guilty of assault, if (1) he reasonably believed someone else was in imminent danger of suffering great bodily injury; (2) he reasonably believed the immediate use of force was necessary to defend against that danger; and (3) he used no more force than was reasonably necessary to defend against that danger.

8

The question whether the trial court erred in refusing to instruct the jury on the self-defense theory turns on whether the record contains substantial evidence that, if believed by the jury, would raise a reasonable doubt as to whether appellants killed Penn in a reasonable effort to defend themselves.

### 3. Application

Here, there was no evidence that appellants acted in self-defense or a heat of passion. There was no evidence that Penn brandished a weapon during the encounter in which he was killed, for example, nor that he acted aggressively in any way. There was no evidence that he had issued verbal threats to the defendants at the Halloween party. The only evidence associating him with any firearm was the gunshot residue on his hands and his sister's statement after the murder that she "got his piece." This evidence indicated at most that Penn had recently touched a gun; nothing tied any such gun use to the Halloween party or his murder. Evidence of gun residue on Penn's hand the day he was killed, without more, does not constitute substantial evidence that appellants killed him in a reasonable effort to defend themselves or in response to an act of provocation sufficient to reduce the crime to manslaughter. Therefore, no basis existed to give self-defense or voluntary manslaughter instructions.

## B. Motion for New Trial

Appellants contend the trial court erred in denying their motions for new trial. We disagree.

### 1. Relevant Proceedings

Appellants filed motions for new trial, arguing that newly discovered evidence, including an enhancement of the surveillance video, showed that Penn fired the first shot.

9

The motions were supported by the declarations of Brenden Johnson and Autumn Kees.  Johnson declared that he was standing with Maden watching an argument develop after the party.  He saw Penn pull out a handgun during the shooting, and ran to his car with Maden after shots were fired.  Appellant Maden's attorney represented that he wanted to call Johnson as a witness during trial, but could not locate him, only later discovering he had been incarcerated.  Matthews's attorney represented that he was unaware of Johnson's potential testimony during trial.

Kees declared that after the party she was talking to friends, including Johnson.  Maden also was present and was talking with Johnson.  Kees saw an "altercation" between "a guy with long hair" and "another male."  A third male approached from the opposite side of the street and snatched chains from the man with long hair.  "The long hair guy then shot at the guy who snatched the chain."  She knew the male with the long hair had fired the shots because she saw him "motion his arm" and she could "see the shots."  She saw no one else fire a gun.  The attorneys declared they were unaware of Kees's information until after trial, when Johnson mentioned her name.  Kees contacted Maden's attorney after hearing about the guilty verdict.

The prosecution opposed the motions, arguing the new evidence was not newly discovered, as the surveillance had been disclosed to Maden during discovery and to Matthews during presentation of the prosecution's case-in-chief, and Johnson was known to the defense attorneys a year and a half before trial.  The prosecution argued that "[a] simple check of the Department of Corrections website" would have revealed Johnson's whereabouts.  Similarly, Kees had been with Maden during the

10

shooting, so he knew long before the end of trial that she might possess exculpatory evidence.

At the hearing on the motions, the court inquired why the video was not enhanced until after the verdicts. Maden's counsel explained that Maden did not ask for the enhancement until the last day of trial, and said that late enhancement was a "trial strategy."

The parties and court viewed the enhanced surveillance video, upon which the court commented, "I will be honest. I'm not sure what I'm looking for. I know what everyone says I should be looking for. I just don't see it," "I'm still having trouble figuring out who is who allegedly."

The court found Destiny Penn's and Carter's testimony to have been "incredibly believable," both having "a huge amount of credibility," and found that Destiny had "the greatest motivation to see the actual killers brought to justice."

But the court expressed concern about the credibility of Johnson and Kees. It found that "the fact that you have two witnesses coming in out of the blue right after the verdict," and "years after the incident," was "questionable" because why would the witnesses allow Maden to "sit in jail for years"? Moreover, Johnson declared he did not see the actual shooting but merely saw Penn pull out a handgun, and thus "was not that probative" and "would not add much" at any retrial.

The court found that Kees's testimony that she saw no one but Penn fire a weapon was "problematic" because that would not explain "the victim being dead." The court found that Kees's testimony would probably not be "enough that it would lead to a different verdict."

Regarding the surveillance video, which we have viewed, the court noted that the enhanced video was "vague at best," and the court "could not tell where the muzzle flash came from." The court saw a figure that could be Penn raise his hand, and what could have been a "muzzle flash" appeared between Penn and another man, who could have been Matthews. The court stated that because the video failed to show "four flashes," it was "not catching" the shooting due to the distance and the "lack of clarity." One interpretation, the court said, was that Matthews "pulled out a gun, the victim in a defensive reflection [*sic*] put his hands out, and then you see the muzzle flash," and "when you couple that with Destiny and [Carter], who were very credible, was it probable that there would be a different verdict? I don't think we have met that standard."

The court commented that Maden's refusal to enhance the surveillance video before the end of trial "was trial strategy because sometimes we don't want to know what certain things are going to say." Trial attorneys know to "[b]e careful what you ask, be careful what rock you look under, because what you find may not help you. It may actually hurt you." As such, it was "sound" defense strategy to not enhance the video earlier.

Finding that a different result was not reasonably probable, the court denied appellants' motions.

### 2. Pertinent Legal Principles

"When a verdict has been rendered . . . against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] 8. When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ." (Pen. Code, § 1181, subd. 8.)

12

"A new trial is a re-examination of the issue in the same Court, before another jury, after a verdict has been given."  (Pen. Code, § 1179.)  It may be granted only if the evidence makes a different result reasonably probable on retrial.  (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016.)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." '  [Citations.]"  (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.)  " '[T]he trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.'  [Citation.]"  (*Id.* at p. 329.)

"The evidence generally *must* be newly discovered."  (*People v. Dyer* (1988) 45 Cal.3d 26, 52.)

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' "  (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.)  " ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' "  (*Ibid*.)  We presume the trial court properly exercised its discretion.  (*People v. Sutton* (1887) 73 Cal. 243, 248.)

13

### 3.    Application

a.    Appellants Failed to Exercise Reasonable Diligence

It was undisputed that Maden possessed the surveillance video before trial but chose not to have it enhanced until too late to present it to the jury.  Maden's counsel stated this was a litigation strategy.  Matthews became aware of the video when the prosecution showed it to the jury, and thus also had time to enhance it before verdicts were rendered.  The trial court could therefore reasonably conclude that appellants failed to exercise reasonable diligence in obtaining the enhanced video.

The trial court could also reasonably conclude that appellants failed to exercise reasonable diligence in obtaining the testimony of Johnson and Kees.  They knew that Johnson had witnessed the shooting but did not make reasonable efforts to obtain his testimony before the end of trial.  Reasonable efforts also would have uncovered the identity of Kees, who was one of Johnson's friends and was standing with him and Maden at the time of the shooting.

Appellants argue that by failing to enhance the video earlier, their attorneys rendered ineffective assistance.  We disagree.

To establish ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that he was prejudiced by the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692; *People v. Williams* (1997) 16 Cal.4th 153, 215.)  "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

14

assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury*, *supra*, 30 Cal.4th at p. 389.)

Here, the record is silent on why Matthews's attorney failed to enhance the video before trial. Maden's attorney admitted that declining to enhance the video was a trial strategy. In either case, the strategy is evident: The attorneys could reasonably have concluded that an enhanced video would show that Matthews shot Penn and Maden yanked the gold chains from Penn's neck, both of which identifications would have contradicted appellants' mistaken identity defense.

> b.     No Different Result was Reasonably Probable

Even had appellants exercised reasonable diligence in obtaining their new evidence, no different result was reasonably probable. The jury had already seen video evidence allegedly showing Penn firing a weapon but had rejected that conclusion. The trial court found that even the enhanced video failed to show what the defense claimed was depicted, a finding with which we concur based on our independent viewing. Based on the vagueness of the video, the court could reasonably conclude it would not have rebutted the testimony of Destiny and Carter, and could thus conclude that no different result was reasonably probable even if the video had been shown to a jury.

**C. The Trial Court Did Not Abuse Its Discretion In Refusing To Unseal The Jurors' Information**

After the verdicts, Maden's counsel allegedly overheard a deputy sheriff tell another deputy that two jurors agreed to vote to convict appellants because they were gang members. Appellants thereafter filed several successive motions to unseal the juror's identifying information pursuant to Code of Civil Procedure section 237. Two hearings were held, after each of which the court denied the motions. Appellants contend the trial court erred in denying them access to juror identifying information. We disagree.

**1. Pertinent Proceedings**

In a declaration attached to two of the motions, Sabrina Harowitz, Maden's counsel, stated that she overheard Los Angeles County Sheriff's Deputy Alvaro Pulido tell another deputy that he overheard one juror tell another during deliberations that he would vote for a guilty verdict because " 'what does it matter, they're gang members anyway. Let's go home.' " Harowitz attached a screen shot from her phone showing that she sent a text message to her paralegal regarding the conversation.

The court held hearings on the matter. Harowitz testified in accordance with her declaration. Deputy Pulido testified that although he escorted the jurors back and forth to the jury room during deliberations, he was unable to hear them discuss the case. He never told anyone he overheard jurors express feelings towards gang members, and had no recollection of the statement Harowitz allegedly overheard. If Pulido believed that jurors acted inappropriately he would seek advice from the court; he had not done so in this case.

16

Over the course of the two hearings, the court observed that this had been "a gang-driven case," and many deputies had been needed to quell a melee in the parking lot. As such, the motion to unseal was potentially asking jurors to walk "a gauntlet from the parking lot," "faced by very hostile family members, perhaps gang members and/or friends." The court noted that Deputy Pulido "made it absolutely clear he never made such a statement," and observed that Matthews's attorney, who was also "within earshot" of Pulido at the time, did not hear the statement. The court noted that conversations involving multiple people are "dynamic" and "fluid," and "tack[] in different directions constantly." The likeliest scenario was that Harowitz, who was "multitasking, trying to get transcripts," misheard Pulido's conversation. Concluding there had been no "prima facie showing that there is a reasonable likelihood" of misconduct, the court denied the motions.

### 2. Legal Principles

A court must seal the records of the personal information of jurors after a verdict in a criminal case. (*People v. Munoz* (2019) 31 Cal.App.5th 143, 165.) A criminal defendant must petition the court to obtain the records. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1430.) " 'The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' " (Code Civ. Proc., § 237, subd. (b).) Such a showing must establish a reasonable likelihood that jury misconduct occurred, or that "talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493.)

17

If the evidence conflicts as to whether misconduct has occurred, it is within the court's discretion to deny a motion to produce juror records.  (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1164.)

We review a trial court's denial of a petition requesting release of juror information for an abuse of discretion.  (*People v. Munoz, supra*, 31 Cal.App.5th at p. 165.)

### 3.    Application

Here, Deputy Pulido testified that he heard no juror discuss the case or say a vote was changed because of the appellants' gang membership.  He had no discussion with another deputy about the jurors' feelings toward gang members, and would have sought the court's guidance had he become aware of any juror misconduct.  Moreover, Matthews's attorney, who was present for the conversation, did not overhear the juror's comment.  In light of this evidence, the trial court did not abuse its discretion in concluding that appellants failed to establish that talking to the jurors would be reasonably likely to produce evidence of juror misconduct.

## D.    Imposition of Consecutive Firearm-Related Sentences Did Not Violate Penal Code Section 654

The court imposed a consecutive sentence of three years on Matthews for possession of a firearm by a felon.  Matthews contends that because he received a 25-year-to-life firearm enhancement, Penal Code section 654 renders the sentence for firearm possession unlawful.  We disagree.

Penal Code section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the

longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Penal Code "section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor. [Citation.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. . . . [¶] On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551-552.)

Even if a defendant harbored a single objective during an indivisible course of conduct, he or she may be convicted and punished for each crime of violence committed against a different victim. (*People v. Miller* (1977) 18 Cal.3d 873, 876; *People v. Deegan* (2016) 247 Cal.App.4th 532, 542.)

"Whether section 654 applies to the fact in a given case is one of fact for the trial court to decide, and such findings will be upheld on appeal if there is any substantial evidence to support them." (*People v. Atencio* (2012) 208 Cal.App.4th 1239, 1242.) An appellate court reviews the trial court's findings in the light most favorable to the judgment and presumes in support of the sentencing order the existence of every fact the jury could reasonably deduce from the evidence. (*Id*. at p. 1243.) " '[T]he

19

power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions from those of the trial court.' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378, original italics.)

Here, the jury convicted Matthews of being a felon in possession of a firearm under Penal Code section 29800, subdivision (a)(1), which requires "conviction of a felony and ownership or knowing possession, custody, or control of a firearm." (*People v. Arce* (2020) 47 Cal.App.5th 700, 714.) "The offense is completed once the intent to possess is perfected by possession." (*Ibid.*)

Whether a violation of subdivision (a)(1) of Penal Code section 29800 "constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "[M]ultiple punishment is improper where the evidence shows that, at most, 'fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense' [citation], such as where the defendant shoots an officer with the gun he wrested away from the officer moments before [citation], or where the shooting follows a struggle with the victim over a gun produced by the victim." (*People v. Vang* (2010) 184 Cal.App.4th 912, 916.) Where the offender must have possessed the firearm before encountering the victim, however, separate punishment for use of

20

a firearm and possession of it is proper. (*Jones*, at p. 1147; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1414.)

Here, the evidence showed that Matthews possessed a gun when he approached and shot Penn. Therefore no fortuitous circumstances placed the firearm in his hands at the moment Penn was killed. Penal Code section 654 therefore poses no bar to imposition of a consecutive sentence for the possession charge.

## E.    The One-Year Enhancement Imposed Against Matthews Must be Stricken

Matthews contends the one-year sentence enhancement is unlawful and must be stricken. Respondent concedes the point, and we agree.

The court imposed a one-year sentence enhancement on Matthews under Penal Code section 667.5, subdivision (b) for having served a prior prison term for a felony conviction. Effective January 1, 2020, Penal Code section 667.5, subdivision (b) was amended to apply only where the prior prison term was served "for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." (Pen. Code, § 667.5, subd. (b).) Because the judgment here is not yet final, the amendment applies to Matthews. (See *People v. Winn* (2020) 44 Cal.App.5th 859, 872-873.)

Matthews's prior prison term was for a conviction for carrying a concealed firearm. Therefore, Penal Code section 667.5 does not apply, and the sentence must be stricken.

### DISPOSITION

The one-year sentence enhancement imposed on Matthews is stricken. In all other respects the judgment is affirmed. The abstract of judgment and the records at the Department of

21

Corrections and Rehabilitation shall be corrected by striking the enhancement.

    NOT TO BE PUBLISHED


                            CHANEY, J.


We concur:



        BENDIX, Acting P. J.



        FEDERMAN, J.*

---

    * Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.