Filed 5/19/22  P. v. Atlas CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B306982 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA460994) |
| v. | |
| JEREMIAH ATLAS, | |
| Defendant and Appellant. | |
| THE PEOPLE, | B307748 |
| Plaintiff and Respondent, | |
| v. | |
| TIMOTHY LOVE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los

Angeles County, George G. Lomeli, Judge.  Affirmed in part, vacated in part, and remanded with directions.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant Jeremiah Atlas.

Dwyer + Kim and Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant Timothy Love.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Amanda V. Lopez, David A. Wildman, and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Jeremiah Atlas (defendant Atlas) and Timothy Love (defendant Love), along with two other companions, fired more than thirty bullets into a car and killed Ontario Courtney. Defendants were each convicted of one count of first degree murder and one count of shooting into an occupied vehicle; the jury acquitted defendants of attempting to murder other observed occupants of the car, who did not testify at trial. In these consolidated appeals from the judgments of conviction, we consider several issues concerning sentencing enhancements: whether the change Assembly Bill No. 333 (2021-2022 Reg. Sess.) (AB 333) makes to law requiring proof of gang predicate offenses applies retroactively and requires vacatur of true findings on the gang allegations and firearm enhancements that depend on the validity of gang enhancements; whether punishment for the shooting into an occupied vehicle conviction should have been stayed, or barred based on the felony murder "merger" doctrine; and whether there is substantial evidence defendants proximately caused the murder victim's death for purposes of a firearm enhancement.

## I. BACKGROUND

### A. *The Murder of Ontario Courtney*

#### 1. *The testifying co-defendant's account of the shooting*

At around 2:00 a.m. on September 13, 2017, co-defendant Dasha Goldston (Goldston) arranged to meet with Jailen Yoakum (Yoakum), a young man with whom she was in a relationship. Goldston drove to Yoakum's home between 3:00 a.m. and 4:00 a.m. The two smoked marijuana in her car for some period of time.

3

Eventually Yoakum went back inside the residence and reemerged with defendant Atlas, defendant Love, and another man. Yoakum said he wanted to take the other men to their homes. Goldston knew Yoakum and defendant Atlas were Main Street Mafia Crips (Main Street) and she considered herself an associate of the gang. Yoakum drove, Goldston sat in the front passenger seat, and defendant Love, defendant Atlas, and the other man sat in the back seat.

Rather than driving his companions home, however, Yoakum drove the car into the territory of the Hoover Criminals street gang. The men in the car started pulling out guns. At some point during the ride, Goldston saw defendant Love flashing his gun and asked him to hand it over. He gave it to her and she tried to put it in the glove compartment. Defendant Love then told her to give the gun back, and she did.

Near an intersection at 51st Street and Hoover Street, defendants and the other men got out of the car with their weapons and Goldston heard a lot of gunfire for approximately five minutes. She ducked down in the car and did not see anything. Goldston heard all four men yell "Main Street." When the men reentered the car, Yoakum was bleeding. He began driving away, but Goldston took over driving at the next traffic light. The police gave chase, and Goldston claimed she did not immediately realize the police were following them.[1]

---

[1] Goldston described events somewhat differently during an interview with police officers than she did at trial. During the interview, Goldston said a man in the back of the other car asked the men in her car "Where are you from," after which they replied "Main Street" and got out of the car and started shooting.

## 2. Other witness accounts

At around 4:30 a.m. on September 13, 2017, Morris Garay was awakened by the sound of gunshots. Garay looked out the window of his home near the intersection of Hoover and 51st Street and saw a dark four door car parked next to a red car. He observed a person standing next to the passenger side of the dark car, and he saw the person fire shots at the red car before getting into the passenger side of the dark car. Garay saw a man who had been "hit," later identified as Courtney, exit the passenger side of the red car, walk toward the front of a house, and fall. Two other occupants of the red car, later identified as Shquana Phillips (Phillips) and Miesha Tyars (Tyars), got out of the car, ran to the wounded man, and screamed for someone to call the police.

Officer Steven Zaby responded to the scene of the shooting. The video from his body camera shows Courtney lying on the ground when Officer Zaby arrived and Phillips and Tyars, along with others, nearby. A medical examiner would later find Courtney sustained three gunshot wounds, one of which was rapidly fatal.

Officer Thomas Call was driving and approaching the intersection of Hoover and 51st Street when he heard three to five seconds of continuous gunfire. He then saw a black Honda traveling westbound on 51st Street turn right on Hoover Street and accelerate quickly. A frantic woman on the sidewalk screamed "go get that vehicle" and Officer Call gave chase. The chase ended when the Honda crashed. Goldston got out of the car and attempted to walk away from the vehicle before she was stopped by the police. Defendants got out of the car too, and they were apprehended. Two firearms were found and recovered

5

inside the vehicle, and two other firearms were found and located outside of and nearby the vehicle.

### 3.   *The aftermath*

Law enforcement officials discovered nine bullet impacts in a church near the scene of the shooting.  They identified thirty to forty shell casings in the street, which they determined came from four different caliber guns.  A firearms analyst would later determine, from an analysis of the shell casings and the guns recovered in and near the black Honda, that 37 shots were fired by the recovered guns: 11 shots from a .45 caliber semiautomatic, 11 shots from a .22 caliber handgun, 10 shots from a nine millimeter handgun, and five shots from a .40 caliber gun.  There were also a slew of bullet impacts observed on the red car (also identified as a maroon SUV), including 20 on the left side of the vehicle alone.

Defendants were placed in a cell together at the police station.  The cell had hidden recording equipment in it. Defendant Love noted "Tiny East and Bink" were lucky because they were juveniles.  Defendant Love wondered how "cuz" (i.e., Yoakum) was shot.  Defendant Atlas thought someone might have shot back at them, but defendant Love disagreed. Defendant Atlas then concluded "cuz shot his self."  Defendants also discussed the story they should tell their lawyers to avoid criminal liability and expressed some concern that "bitch" (presumably Goldston) would be "running her mouth."

### B.   *The Charges*

Defendant Love was charged in a four count information in May 2019.  In February 2020, the prosecution filed an amended

information charging both defendants; Goldston was also named as a co-defendant.

As relevant for our purposes,[2] the amended information alleges defendants and Goldston committed four crimes. Count one alleges defendants and Goldston murdered Courtney with malice aforethought in violation of Penal Code section 187, subdivision (a).[3] Counts two and three allege defendants and Goldston attempted to murder Phillips and Tyars willfully, deliberately, and with premeditation, in violation of sections 664 and 187, subdivision (a). Count four alleges defendants and Goldston willfully, unlawfully, and maliciously discharged a firearm at an occupied motor vehicle in violation of section 246.

As to each of these counts, the information alleged the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. It further alleged as to these counts that defendants personally and intentionally discharged a handgun causing Courtney's death (§ 12022.53, subd. (d)), personally and intentionally discharged a handgun (§ 12022.53, subd. (c)), and personally used a handgun (§ 12022.53, subd. (b)). Additionally, the information alleged *a principal* (§ 12022.53, subd. (e)) personally and intentionally discharged a firearm causing great bodily injury

---

[2]     The information also alleged fifteen counts against defendant Atlas in connection with a separate incident. Those counts were severed and tried separately, and they are not at issue in this appeal.

[3]     Undesignated statutory references that follow are to the Penal Code.

and death, personally and intentionally discharged a firearm, and personally used a firearm.

### C.    *Pertinent Trial Proceedings*

The prosecution called numerous witnesses, including Garay and law enforcement personnel.[4]  Goldston called witnesses and testified in her own defense.  Neither defendant Atlas nor defendant Love testified.

Among the many witnesses for the prosecution was Officer Alex Zamora of the Los Angeles Police Department, who served as the prosecution's gang expert on Main Street.  Among other things, Officer Zamora testified regarding two predicate offenses committed by individuals he knew to be members of Main Street.  The first, Austin Milligan, was convicted of a robbery that occurred on or about September 13, 2017.  The second, Gary Wooley, was convicted of an attempted murder perpetrated on November 10, 2017.  Officer Zamora opined that defendants were members of Main Street.

Officer Zamora was also presented with a hypothetical that tracked the facts of this case.  He opined the crimes would have been committed in association with the gang and for the benefit of the gang, with the specific intent to further criminal conduct by gang members.

### D.    *Verdicts and Sentencing*

The jury convicted both defendants of murder as charged in count one and fixed the degree at first degree murder.  The jury

---

[4]    Phillips and Tyars were subpoenaed to appear at trial, but neither did.

8

also found true the following allegations in connection with the murder conviction in count one: (1) a principal personally and intentionally discharged a handgun, which caused Courtney's death, within the meaning of section 12022.53, subdivisions (d) and (e)(1); (2) a principal personally and intentionally discharged a handgun within the meaning of section 12022.53, subdivisions (c) and (e)(1); (3) a principal personally used a handgun within the meaning of section 12022.53, subdivisions (b) and (e)(1); and (4) the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist criminal conduct by gang members, pursuant to section 186.22, subdivision (b)(1)(C).

The jury also convicted both defendants of shooting at an occupied motor vehicle as charged in count four. The jury found true the following allegations in connection with that conviction: (1) defendants personally and intentionally discharged a handgun, which caused Courtney's death, within the meaning of section 12022.53, subdivision (d); (2) defendants personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); (3) defendants personally used a firearm within the meaning of section 12022.53, subdivision (b); and (4) the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist criminal conduct by gang members, pursuant to section 186.22, subdivisions (b)(1)(C) and (b)(4).

The jury acquitted defendants on the two attempted murder charges in counts two and three of the amended information that named Phillips and Tyars as the victims.

9

In advance of sentencing, defendant Love filed a memorandum arguing, in pertinent part, that the jury's not guilty finding regarding the two counts of attempted murder demonstrated there was insufficient evidence to conclude Tyars and Phillips were in the vehicle at the time of the shooting, and thus, the sentence on count four should be stayed pursuant to section 654. Defendant Atlas's sentencing memorandum similarly argued section 654 required staying his sentence on count four.

The trial court found no section 654 stay was warranted. The court reasoned the jury could have concluded, without contradiction, that defendants were not guilty of the attempted murder of Tyars and Phillips but both occupied the car at the time of the shooting for purposes of section 246. Giving an example, the court explained that firing at an occupied vehicle is a general intent crime and the jury could have accordingly believed Tyars and Phillips were in the car but defendants were not aware of their presence—which would negate the intent required for attempted murder but not the intent required for shooting at an occupied vehicle.

The trial court sentenced each defendant to a term of 25 years to life for Courtney's murder. It added an additional term of 25 years to life under section 12022.53, subdivisions (d) and (e), based on the jury's true finding on the principal-discharge of a firearm causing death and gang allegations. For the shooting at an occupied vehicle conviction, the court sentenced both defendants to a consecutive term of 15 years to life, plus an additional term of 20 years to life—not the 20-year determinate term that is actually authorized by the statute—for personal

10

discharge of a firearm pursuant to section 12022.53, subdivision (c).

As to count four, the minute orders of the sentencing hearing state as follows: "15 years to life pursuant to Penal Code section 246, elevated pursuant to the dictates of Penal Code section 186.22(b)(4)[.] [¶] 20 years to life pursuant to Penal Code section 12022.53(c)[.]"

## II. DISCUSSION

For reasons we first summarize and then explain, all of the trial court's rulings predicated on then-existing law do not warrant reversal but the gang enhancement true findings and related firearm enhancement true findings must be vacated in light of AB 333.

The "merger" doctrine discussed in *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) has no application here because it is limited to felony murder cases and this is not a felony murder case; merger-like principles instead arise in connection with the issue of whether section 654 compels staying defendants' sentences for shooting at an occupied vehicle. Substantial evidence supports the trial court's decision to refrain from ordering such a stay. Garay saw three people in the car that defendants and their accomplices fired at 37 times, and those facts permit a finding that defendants harbored an objective in shooting at the car independent of the objective to kill Courtney. The jury's acquittal of defendants on the two attempted murder charges does not fatally undermine this conclusion, and no Sixth Amendment issue arises with such a finding because section 654 operates to reduce a sentence, not to increase it. Substantial evidence also supports the jury's true finding, in connection with

11

the shooting at an occupied vehicle convictions, that defendants personally discharged a handgun causing victim Courtney's death. Though there is no evidence indicating which gun fired the fatal bullet, there is adequate evidence defendants were each a substantial concurrent cause of Courtney's death—and that is enough under controlling and persuasive precedent.

Defendants' arguments concerning the effect of AB 333, on the other hand, have merit—as the Attorney General largely concedes. The amendments AB 333 made to the definition of a "pattern of criminal gang activity" in section 186.22 apply retroactively to defendants and render the prosecution's evidence of predicate acts insufficient. We shall accordingly vacate the gang enhancement true findings and remand for retrial if the People so elect. We will also vacate the related firearm enhancements that depend on the validity of the gang enhancement true findings, and all this will require resentencing whether or not the vacated enhancements are retried.

### A. The Merger Doctrine Is Inapposite

Defendant Atlas, joined by defendant Love, contends the count four offense of shooting at an occupied vehicle should "merge" into the count one offense of murder, relying on the merger doctrine as set forth in *Chun*, *supra*, 45 Cal.4th 1172. The flaw in this argument is that the merger doctrine only controls cases in which the felony murder rule applies.

The felony-murder rule makes a killing that occurs during the commission of certain felonies murder "without the necessity of further examining the defendant's mental state." (*Chun*, *supra*, 45 Cal.4th at 1182.) "First degree felony murder is a killing during the course of a felony specified in section 189, such

12

as rape, burglary, or robbery.  Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . .' [Citation.]" (*Ibid.*)

The merger doctrine developed as a limit on the second degree felony-murder rule to "ameliorate [the rule's] perceived harshness." (*Chun, supra*, 45 Cal.4th at 1188.)  Under the merger doctrine, "the underlying felony must be an independent crime and not merely the killing itself.  Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder." (*Id.* at 1189.)  "When the underlying felony is assaultive in nature, such as violation of section 246 or 246.3, . . . the felony merges with the homicide and cannot be the basis of a [second degree] felony-murder instruction." (*Id.* at 1200.)

No felony murder instruction was given in this case: the jury was instructed on malice aforethought, premeditation and deliberation, and unpremeditated murder of the second degree, but not felony murder.  Pulling selected quotes from *Chun* that use more general language, defendant Atlas contends *Chun* and the merger doctrine are not limited to felony-murder scenarios.  But this is a misreading of *Chun*, which describes the merger doctrine only as a restriction on the second degree felony-murder rule. (*Chun, supra*, 45 Cal.4th at 1188-1189; see also *People v. Ireland* (1969) 70 Cal.2d 522, 540.)  The merger doctrine has no application here.

13

*B.*      *Substantial Evidence Supports the Trial Court's*
          *Section 654 Determination*

Section 654 provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a); see generally *People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)  Both defendants appropriately concede the crimes here involved a course of conduct (a multiplicity of gunshots), not a single physical act.

Section 654 prohibits punishment for multiple crimes arising from a single indivisible course of conduct.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.)  The application of section 654 "turns on the *defendant's* objective in violating" multiple statutory provisions rather than temporal proximity. (*People v. Britt* (2004) 32 Cal.4th 944, 952.)  If both crimes for which defendants were convicted (murder and shooting at an occupied vehicle) were merely incidental to or were the means of accomplishing or facilitating one objective, defendants may be punished only once.  (*Ibid*.)  "If[, on the other hand,] a defendant 'entertain[s] multiple criminal objectives which [are] independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations share[ ] common acts or [are] parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Williams* (1992) 9 Cal.App.4th 1465, 1473, first bracketed insertion added.)

The question of whether section 654 applies is a question of fact for the trial court; "[i]ts findings will not be reversed on appeal if there is any substantial evidence to support them."

14

(*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Ibid.*)

Substantial evidence supports the decision here to refrain from staying punishment for the shooting at an occupied vehicle conviction. The evidence presented at trial permits a finding that defendants entertained multiple independent criminal objectives, for instance, an objective to kill one of the occupants and an objective to only injure or harass and intimidate the others (or, alternatively, to damage and disable the car they occupied to prevent them from giving chase after the shooting). In our view, these differing objectives are fully consistent with the jury's verdicts, including the acquittal of defendants on the charge of attempting to murder Phillips and Tyars. But even if defendants were right that positing separate objectives would be inconsistent with the jury's not guilty verdicts on the attempted murder charges, that still would not be cause to reverse because the verdicts can be explained on lenity grounds and do not necessarily reflect a belief by the jury, as defendants assume (contrary to Garay's testimony), that Courtney was "the only person who 'occupied' the red car . . . during the lethal shooting." (See *People v. Abilez* (2007) 41 Cal.4th 472, 512-513 [inconsistency in verdicts "'may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict'"].)

Defendants, however, protest that it was a violation of their Sixth Amendment rights for the trial court to make the factual finding that there were multiple victims in the car because the question was neither posed to nor answered by the jury. The

prohibition against such findings discussed in *People v. Gallardo* (2017) 4 Cal.5th 120 pertains to the circumstance of a sentencing court making findings about the facts underlying a defendant's prior conviction in order to impose additional punishment for a current conviction. (*Id.* at 124.) That, of course, is not the situation here. Regardless, the Sixth Amendment right to a jury trial does not apply to trial court findings under section 654 anyway. (See, e.g., *People v. Deegan* (2016) 247 Cal.App.4th 532, 547-550; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1021-1022.) "'"The question of whether section 654 operates to 'stay' a particular sentence does not involve the determination of any fact that could increase the penalty for a crime beyond the prescribed statutory maximum for the underlying crime. . . .' [Citation.] ' . . . [S]ection 654 is not a sentencing 'enhancement.' On the contrary, it is a sentencing 'reduction' statute."'" (*People v. Carter* (2019) 34 Cal.App.5th 831, 846.)

> C. *Substantial Evidence Supports the Section 12022.53, Subdivision (d) Enhancement Found True in Connection with the Shooting at an Occupied Vehicle Conviction*

Section 12022.53 prescribes "sentence enhancements (prison terms of 10 years, 20 years, and 25 years to life) for increasingly serious circumstances of firearm use." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1149.) Subdivision (d) authorizes an additional, consecutive term of 25-years-to-life when a defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in

16

Section 12022.7, or death, to any person other than an accomplice . . . ."  (§ 12022.53, subd. (d).)

"Section 12022.53(d) requires . . . only that [the defendant] 'proximately caused' the great bodily injury or death."  (*People v. Bland* (2002) 28 Cal.4th 313, 336 (*Bland*).)  "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet . . . . [¶] . . . [S]ection 12022.53(d) does not require that the defendant fire a bullet that directly inflicts the harm.  The enhancement applies so long as defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result."  (*Id.* at 337-338.)

"[I]t has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death."  (*People v. Sanchez* (2001) 26 Cal.4th 834, 846 (*Sanchez*).)  "The circumstance that it cannot be determined who fired the single fatal bullet, i.e., that direct or actual causation cannot be established, does not undermine defendant's . . . murder conviction if it was shown beyond a reasonable doubt that defendant's conduct was a substantial concurrent cause of [the victim's] death."  (*Id.* at 845.)  Multiple individuals engaged in the same gun battle resulting in the death of a victim from a single bullet may thus all be proximate causes of the victim's death.  (*Ibid.*)

The facts in *Sanchez* bear this out.  Two members of rival gangs engaged in a gun fight and an innocent bystander was hit by a stray bullet and killed.  (*Sanchez*, *supra*, 26 Cal.4th at 838.)  The parties agreed they could not establish whether the defendant or the rival gang member fired the fatal shot.  (*Id.* at 845.)  Our high court found that though "it could not be

17

determined who was the direct or actual shooter of the single fatal round, the evidence, with all reasonable inferences drawn in favor of the guilty verdicts, supports a finding that defendant's commission of life-threatening deadly acts in connection with his attempt on [the rival gang member's] life was a substantial concurrent, and hence proximate, cause of [the bystander's] death." (*Id.* at 848-849.)

Here, substantial evidence supports the conclusion that both defendants were proximate causes of Courtney's death. They were both in the car when it arrived at the scene of Courtney's murder. Goldston testified both defendants had guns, and both defendants exited the car along with Yoakum and the other man, proclaiming their affiliation to Main Street. As much as five minutes of gunfire followed. When police investigated the scene after the shooting, they found multiple shell casings from four different guns. This is sufficient evidence for the jury to find beyond a reasonable doubt that both defendants shot at Courtney and their deadly acts were proximate causes of his death—regardless of whose bullet inflicted the fatal blow.

Defendants agree there is substantial evidence they each personally discharged a firearm, but they contend they could have proximately caused Courtney's death only if the act of firing their guns "set[ ] in motion a chain of events that produce[d] as a direct, natural, and probable consequence" the shooting of Courtney and "without which the . . . death would not have occurred." Defendants extrapolate upon this quoted statement, taken from *Bland,* to posit that setting a chain of events in motion necessarily contains a temporal requirement—meaning defendants could only be a proximate cause of Courtney's death if they shot first.

18

The quoted language from *Bland* is a recitation of CALJIC No. 17.19.5, the pattern jury instruction regarding the section 12022.53, subdivision (d) enhancement (*Bland*, *supra*, 28 Cal.4th at 335), and *Bland* itself does not establish such a temporal requirement.  Moreover, *Bland* cites with approval the concept of concurrent causation, as explained in CALJIC 3.41.[5]  (*Id.* at 335, 338 ["'There may be more than one cause of the [great bodily injury or death].  When the conduct of two or more persons contributes concurrently as a cause of the [great bodily injury or death], the conduct of each is a cause of the [great bodily injury or death] if that conduct was also a substantial factor contributing to the result.  A cause is concurrent if it was operative at the moment of the [great bodily injury or death] and acted with another cause to produce the [great bodily injury or death].  [¶]  [If you find that the defendant's conduct was a cause of [great bodily injury or death] to another person, then it is no defense that the conduct of some other person [, even the [injured] [deceased] person,] contributed to the [great bodily injury or death]]"].)  Defendants' reliance on Justice Kennard's dissenting opinion in *Bland* is unpersuasive.

---

[5]      The jury in this case was instructed with CALJIC 17.19.5. Though the Use Notes to that instruction provide that CALJIC 3.41 should also be given where there is more than one cause of the bodily injury or death, CALJIC 3.41 was not read to the jury. Neither defendant objected to the omission below, or requested the inclusion of the instruction, and neither argue on appeal that the instruction should have been given.

19

D. *Gang Allegations and AB 333*

In his opening brief, defendant Love argued the jury's true findings on the gang allegations (namely, that both counts one and four were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist criminal conduct by gang members) should be vacated because the trial court erred by instructing the jury to consider crimes that did not qualify as predicate offenses when determining whether the prosecution had proved the requisite elements. Defendant Atlas joined in the argument. In supplemental briefing, defendants argue newly enacted AB 333 applies retroactively to them because their convictions are not final. Specifically, defendants argue they should benefit from the amendment to section 186.22 that provides the offenses used to prove a pattern of criminal gang activity cannot include the offense for which the defendant is being tried. (See Stats. 2021, ch. 699, § 3, adding Pen. Code § 186.22, subd. (e)(2) ["The currently charged offense shall not be used to establish the pattern of criminal gang activity"].)

The Attorney General concedes defendants are entitled to the benefit of this amendment to section 186.22. The concession is appropriate; we agree the statutory change applies retroactively under the rule announced in *In re Estrada* (1965) 63 Cal.2d 740 at pages 744-745 and further discussed in *People v. Figueroa* (1993) 20 Cal.App.4th 65 at pages 68 and 70-71 (*Figueroa*).

As the Attorney General further concedes, one of the predicate offenses used to establish the gang's pattern of criminal activity in this case occurred after the date of defendants' offenses. "Crimes occurring *after* the charged offense cannot

20

serve as predicate offenses to prove a pattern of criminal gang activity." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458.) Thus, the prosecution cannot have sufficiently proven the existence of two or more predicate offenses under the law as amended by AB 333 because the current offenses of conviction cannot be relied on as predicate offenses that prove a pattern of gang activity.

Under the circumstances, we believe the proper remedy is to vacate the gang enhancements—specifically, the true findings on the section 186.22, subdivision (b) allegations attached to both counts of conviction—and to remand with directions to permit retrial of those enhancements (under currently prevailing law) if the People so elect. (See *Figueroa, supra*, 20 Cal.App.4th at 71-72 & fn. 2 [remand appropriate to allow prosecution to establish additional element retroactively added by statutory amendment]; see also *People v. Lopez* (2021) 73 Cal.App.5th 327, 346 [vacating enhancements in light of AB 333 and remanding for limited retrial].)

Defendants argue that if the true findings on the gang allegations are vacated, certain other enhancements must also be vacated. Specifically, defendants argue the jury's true finding in connection with count one that a principal personally used and discharged a firearm causing death under sections 12022.53, subdivisions (b), (c), (d), and (e)(1), and its true findings on count four that they personally used firearms under section 12022.53, subdivision (b) and personally discharged firearms under section 12022.53, subdivision (c), should be vacated. That is correct and we shall vacate those enhancements as well, though they are likewise subject to re-imposition if the gang enhancements are retried.

21

One final matter. At sentencing, the trial court's oral pronouncement of sentence added an additional term of imprisonment, pursuant to section 12022.53, subdivision (c), to each defendant's sentence on count four. The court remarked imposing additional punishment pursuant to section 12022.53, *subdivision (d)* may be subject to section 654 but punishment for personal discharge pursuant to section 12022.53, subdivision (c) was not. As stated, we are vacating the enhancement imposed pursuant to section 12022.53, subdivision (c), and this will require resentencing and a final determination regarding staying punishment for the section 12022.53, subdivision (d) enhancement.

DISPOSITION

Defendants' convictions are affirmed. The gang allegation true findings (§ 186.22, subd. (b)) attached to counts one and four are vacated as to both defendants. The principal-armed allegation true findings (§ 12022.53, subds. (b)-(d), (e)(1)) attached to count one are vacated as to both defendants. The personal discharge (§ 12022.53, subd. (c)) and personal use (§ 12022.53, subd. (b)) firearm allegation true findings attached to count four are vacated as to both defendants. The People may retry the vacated gang and firearm allegation true findings if they so elect. At resentencing, which is required whether or not the vacated true findings are retried, the trial court shall resolve the issue of a section 654 stay of punishment for the section 12022.53, subdivision (d) true finding attached to count four.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.

23